*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0313p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

REZVAN GHOLAMHOSSEIN KARIMIJANAKI and
HESAMEDDIN NOSSONI,

*Petitioners,*

*v.*

ERIC H. HOLDER, JR., United States Attorney
General,

*Respondent.*

No. 08-4622

_____

On Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A45 832 080; A45 832 083.

Argued: August 5, 2009

Decided and Filed: August 28, 2009

Before: SILER, MOORE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Marshal E. Hyman, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy,
Michigan, for Petitioners. M. Jocelyn Lopez Wright, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Marshal E. Hyman, Russell
Reid Abrutyn, MARSHAL E. HYMAN & ASSOCIATES, PC, Troy, Michigan, for
Petitioners. M. Jocelyn Lopez Wright, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. Rezvan Gholamhossein Karimijanaki and her son,

Hesameddin Nossoni, seek review of a decision of the Board of Immigration Appeals ("BIA"

or "Board") affirming an immigration judge's ("IJ") order that they be removed to their

native country of Iran. Because sufficient evidence supports the Board's and IJ's rulings that

1

Karimijanaki abandoned her lawful permanent resident status, her seven-year absence from the United States was not a temporary visit abroad, her conduct was imputable to Nossoni (an unemancipated minor during the relevant period), and Nossoni did not automatically acquire citizenship based upon his father's naturalization prior to the removal proceedings, we deny the petition for review.

I.

In October 1997, Karimijanaki and her husband, Ali Nossoni, along with three of their four children, Golrokh, Farideddin, and eight-year-old Hesameddin Nossoni, were admitted as lawful permanent residents ("LPR") pursuant to an immigrant visa petition filed by Ali's brother in 1986.[1] Their fourth child, Zahra, remained in Iran because she was 21 years old and therefore ineligible for derivative LPR status from her uncle's petition. That same year, Ali filed a petition for Zahra to immigrate to the United States as the unmarried daughter of a lawful permanent resident.

Following his admission, Ali remained in the United States. Karimijanaki, however, returned to Iran with her children after spending one month in the United States.[2] Her stated purpose in doing so was to care for Zahra, who had no immigrant visa and was culturally forbidden from living alone in Iran as an unmarried woman. Although Karimijanaki's mother and sister lived in Iran, Karimijanaki testified that they could not serve as Zahra's chaperones because they did not reside in Tehran, where Zahra attended a university. According to Karimijanaki, Zahra could neither transfer to a different school nor live in a dormitory because she was a Tehran resident (the dorms were reserved for students from outside the region) and employed. Believing that she could remain abroad for as long as ten years – the valid period of her immigrant visa – and still retain her LPR status, Karimijanaki intended to remain in Iran until Zahra received her LPR status, a process she was told would take approximately two years but which, in reality, took ten.

---

[1] The parties agree that portions of the record incorrectly list January 1997 as the date of admission.

[2] Petitioners' assertion in their appellate brief that two of the children lived with their father in the United States from 1997 until 2005 contradicts petitioner Hesameddin Nossoni's testimony.

In 2003 or 2004, Golrokh and Farideddin returned to the United States to live with their father in Michigan, where they attended college. Petitioners Karimijanaki and Hesameddin Nossoni, however, remained continuously in Iran until their return to the United States in June 2005. While living in Iran during this approximately seven-year period, petitioner Hesameddin Nossoni attended school. Petitioner Karimijanaki did not work but supported herself and her children with money her husband sent from the United States. In addition, she received some assistance from Zahra. Karimijanaki owned two apartments in Iran and had a joint bank account with Zahra. She did not own a home, work, or have a bank account in the United States, and she had no permits authorizing her re-entry to the United States.

Ali Nossoni traveled twice from the United States to Iran to visit his family. His trips included a 35-day visit in 1999, and a four- to six-week visit at an unspecified later date.

Although Zahra had not yet acquired an immigrant visa, petitioners nevertheless returned to the United States without her in June 2005 so that petitioner Hesameddin Nossoni, who was then sixteen years old, could avoid mandatory military service in Iran. Allegedly, the Iranian government did not allow males to leave Iran once they turned seventeen to insure their availability for military service at eighteen.

Upon their attempted re-entry to the United States in June 2005, Karimijanaki had an open-ended return ticket to Iran that was valid for one year, but petitioner Hesameddin Nossoni had a one-way ticket. Karimijanaki told immigration officials that she intended to stay in the United States for one year, during which time she planned to resolve Zahra's visa issue and apply for citizenship. If she could not achieve these goals, Karimijanaki acknowledged that she "might return" to Iran to re-join Zahra, although she would "forget the ticket" if required to stay longer in the United States.

Immigration authorities served Karimijanaki and her son with notices to appear alleging that they had abandoned their permanent residence in the United States and were subject to removal because they did not have valid visas or entry documents. Petitioners denied that they had abandoned their residence and were removable, and they

were granted temporary parole into the United States pending a hearing before an immigration judge.

Within months of petitioners' attempted re-entry to the United States, Karimijanaki's mother passed away, and her sister, who was retired and had been caring for her mother, moved to Tehran to live with Zahra. They lived together from 2005 until 2007. In 2005 or 2006, Zahra earned her master's degree from the Tehran university she attended.

At the July 20, 2007, merits hearing, both petitioners were represented by private counsel and were the only witnesses to testify.[3] Karimijanaki testified that she had not left the United States since her return in June 2005, that her husband had obtained his United States citizenship, and that Zahra had received her immigrant visa through her father's petition and was flying to the United States that evening. Ali Nossoni, who lived and worked previously in Detroit for five years, had accepted employment and began living in Anaheim, California, approximately two-and-a-half years before the hearing. Karimijanaki, Golrokh, Farideddin, and petitioner Hesameddin Nossoni, however, lived in Detroit because the children were attending college in the area. Petitioner Hesameddin Nossoni also testified that on the day of the hearing, his unmarried sister Golrokh was traveling by herself in Greece.

In his written opinion, the IJ ruled that Karimijanaki abandoned her LPR status and that her seven-year absence from the United States was not a "temporary visit abroad," imputed her conduct to her minor son, petitioner Hesameddin Nossoni, rejected his claim that he automatically acquired United States citizenship when his father was naturalized in 2006, found petitioners removable, and ordered that they be removed to Iran. Subsequently, the Board dismissed petitioners' appeal, affirming all of the IJ's rulings but not addressing the claim that petitioner Hesameddin Nossoni automatically acquired citizenship upon his father's naturalization.

Petitioners timely requested review.

---

[3] Ali Nossoni was present and available to testify at the hearing but was not called as a witness.

II.

Where the Board affirms the IJ's ruling but adds its own comments, we review both the IJ's decision and the Board's additional remarks. *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). A deportability order is valid only if "it is based upon reasonable, substantial, and probative evidence." 8 U.S.C. § 1229a(c)(3)(A). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and "enough [evidence] to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20 (1966) (defining "substantial evidence" under the Administrative Procedure Act) (citations omitted). The Court has cautioned that "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* In other words, "[u]nder this deferential standard, we may not reverse the Board's determination simply because we would have decided the matter differently." *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001).

"[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary[.]" 8 U.S.C. § 1252(b)(4)(B); *Huang v. Mukasey*, 523 F.3d 640, 651 (6th Cir. 2008). Although legal conclusions are given fresh review, *see Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006), we give "deference to the BIA's reasonable interpretation of the statutes and regulations." *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843-44 (1984)).

A.

Karimijanaki challenges the Board's decision affirming the IJ's rulings that she abandoned her LPR status and that her more than seven-year absence from the United States between the latter part of 1997 and June 2005 was not a "temporary visit abroad."

1.

"The term 'lawfully admitted for permanent residence' means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20). An LPR who returns from a visit abroad may be considered a "returning resident" eligible for re-entry to the United States without producing a passport, immigrant visa, re-entry permit, or other document. 8 U.S.C. § 1101(a)(27)(A); 22 C.F.R. § 42.22(a); 8 U.S.C. § 1181(b). However, to justify those privileges, the alien must have "departed from the United States with the intention of returning and has not abandoned this intention" and "is returning to the United States from a temporary visit abroad and, if the stay abroad was protracted, this was caused by reasons beyond the alien's control and for which the alien was not responsible." 22 C.F.R. § 42.22(a)(2) & (3). In addition, "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States . . . unless the alien . . . has abandoned or relinquished that status" or "has been absent from the United States for a continuous period in excess of 180 days[.]" 8 U.S.C. § 1101(a)(13)(C)(i) & (ii).

The parties agree that where, as here, petitioners have "'colorable claim[s] to returning resident status, . . . the [government] has the burden of proving [they are] not eligible for admission to the United States.'" *Hana v. Gonzales*, 400 F.3d 472, 475 (6th Cir. 2005) (quoting *Singh v. Reno*, 113 F.3d 1512, 1514 (9th Cir. 1997)). That burden requires the government to establish petitioners' ineligibility for admission by "clear and convincing evidence." 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a); *Pickering v. Gonzales*, 465 F.3d 263, 269 n.3 (6th Cir. 2006). "[A] decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law[.]" 8 U.S.C. § 1252(b)(4)(C).

In determining whether an alien has abandoned her LPR status, we examine "the totality of the alien's circumstances," including "the location of the alien's family, property, and job, and of course the length of the alien's trip(s) abroad" but also "other

evidence in the record demonstrating the alien's intent with regard to maintaining her LPR status." *Hana*, 400 F.3d at 476. The alien's intent is measured by an objective standard. *See Singh*, 113 F.3d at 1515 ("An alien's desire to retain his status as a permanent resident, without more, is not sufficient; his actions must support his professed intent."). However, an individual with LPR status may also abandon that status by unintentional acts. *In re Duarte*, 18 I. & N. Dec. 329, 332 n.3 (BIA 1982) ("Lawful permanent resident status may . . . be lost through abandonment, intentional or unintentional[.]").

The term "temporary" in "temporary visit abroad" "is not merely an antonym of 'permanent,'" *Singh*, 113 F.3d at 1514; rather, a visit abroad is temporary "if (a) it is for a relatively short period, fixed by some early event; or (b) . . . will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time." *Hana*, 400 F.3d at 476 (quoting and approving *Singh*, 113 F.3d at 1514); *see also Hana*, 400 F.3d at 476 (approving the Second Circuit's clarification that "when the visit 'relies upon an event with a reasonable possibility of occurring within a short period of time . . . the intention of the visitor must still be to return within a period relatively short, fixed by some early event.'") (quoting *Ahmed v. Ashcroft*, 286 F.3d 611, 613 (2d Cir. 2002)).

2.

After a thorough analysis, the Board and IJ ruled that Karimijanaki abandoned her residence and took more than a temporary visit abroad. Supporting those conclusions, they found that, from the latter part of 1997 until June 2005, Karimijanaki never lived longer than one month in the United States and neither made a single return visit to the United States nor applied for a re-entry permit. The IJ also deemed it significant that, although three of her four children obtained immigrant visas through their uncle's petition and her husband remained in the United States, Karimijanaki nevertheless took all three children back with her to Iran in 1997, where they lived for an extended five- to seven-year period.

The Board and IJ noted that when Karimijanaki returned to the United States in June 2005, her admitted purpose was not to remain in the United States; rather, she desired to help her son avoid mandatory military service in Iran, resolve her daughter's visa issues, and merely apply for citizenship (without staying). After her intended year-long visit to the United States, Karimijanaki again planned to return to Iran to live with Zahra, who was then a 29-year-old adult residing with her aunt, until her daughter obtained an immigrant visa.

The Board agreed with the IJ's characterization of Karimijanaki's argument that cultural norms compelled her to live with Zahra as "overstated." The IJ noted that Karimijanaki told an immigration officer that she planned to leave Zahra alone in Iran during her intended year-long stay in the United States in 2005; that Zahra's aunt began living with Zahra two months after Karimijanaki's June 2005 arrival in the United States, thereby leaving Zahra alone in Iran for the two months before her aunt joined her; and that Karimijanaki's younger, unmarried daughter Golrokh was traveling by herself in a foreign country on the hearing date. Based upon this evidence, the IJ found that while Karimijanaki "may have strongly preferred her daughter not live alone, this preference clearly did not amount to an entirely inflexible prohibition."

Assuming arguendo that such cultural norms prohibited unmarried women from living alone in Iran, the IJ rejected Karimijanaki's contention that Zahra could not live with her aunt after she finished her bachelor's degree. The IJ also questioned why Karimijanaki had to return to Iran to accompany her unmarried daughter in 2005 when Zahra was not then living alone, but was companioned by her aunt. In other words, granting that Karimijanaki may initially have been compelled to return to Iran, the IJ reasoned that "she remained in Iran by choice long after necessity demanded it."

The IJ was further persuaded by the extent of Karimijanaki's ties to Iran and the absence of her contacts with the United States between 1997 and June 2005. In particular, Karimijanaki had a joint bank account with Zahra, owned two apartments, and sent her children to school in Iran. She had no home or bank account in the United States. Although her husband lived and worked in the United States, Karimijanaki never

traveled to the United States to visit him during the entire seven-year period. Instead, her husband traveled twice to Iran to visit his family.

Finally, the IJ ruled that Karimijanaki's absence from the United States was not a "temporary visit abroad." Notwithstanding her approximately seven-year stay in Iran after obtaining LPR status, the IJ found that she intended to remain in Iran until her daughter married or obtained an immigrant visa. These events, according to the Board and IJ, did not have a "reasonable possibility" of occurring "within a short time period," but their occurrences, if at all, were "indefinite." The IJ characterized as "completely unreasonable" Karimijanaki's belief that Zahra would receive her immigrant visa in two years because the process took six years at that time, and Karimijanaki had waited eleven years to acquire her own immigrant visa. Giving Karimijanaki the benefit of the doubt, however, the IJ reasoned that "[a]lthough [she] may have initially believed it would only take two years [for Zahra to obtain her immigrant visa], at some point during the ten-year process, she must have become aware that the process would actually take much, much longer." In any event, the IJ concluded that it was "speculative" whether Zahra would even receive a visa.

Based upon these findings, the IJ ruled that "[i]t was [Karimijanaki's] two trips to the United States, not her life in Iran, which constituted temporary visits abroad." In addition, her "inten[t] to reside in the United States eventually at some nebulous point in the future" was "insufficient to show she did not intend to abandon her residency."

3.

Although Karimijanaki concedes that "[w]hile the amount of time [she] spent in Iran would, by itself, support a finding of abandonment," she argues that "the totality of the circumstances compels" a contrary conclusion. Her central complaint is that "[t]he BIA severely punished [her] for attempting to fulfill her obligation[]" to care for Zahra in Iran until Zahra received her own immigrant visa. She acknowledges that "[t]he time . . . this took was not fixed by a definite end date but there was a reasonable possibility that it would happen within a short time period." According to Karimijanaki, legislation passed by the Congress in 2002 would have protected her family from separation,

thereby allowing her to avoid having to return to Iran, but she regrets that such legislation "came too late." She also asserts that her ties to the United States were "cement[ed]" because her husband lived and worked in the United States and provided her with financial support, and her children, Golrokh and Farideddin, lived and studied in the United States. Moreover, she highlights her husband's naturalization as evidence of her own intent to become a United States citizen. "To conclude that Ms. Karimijanaki intended to abandon her status," she argues, "would mean that she intended for her three oldest children and her husband to obtain lawful permanent residency and United States citizenship without her." Finally, Karimijanaki asserts that she misunderstood the law, incorrectly assumed that she could remain abroad for the ten-year period in which her immigrant visa was valid without jeopardizing her LPR status, and miscalculated the length of time required for Zahra to receive her immigrant visa.

In support of her arguments, she relies upon our decision in *Hana v. Gonzales*. After acquiring her LPR status, Hana immediately filed immigrant visa petitions for her husband and children and was told that her children would receive visas within three years. *Hana*, 400 F.3d at 474. Two months after acquiring her LPR status, Hana returned to her job in Saddam Hussein's Iraq where she spent "the bulk of her time" over a four-and-a-half-year period. *Id*. at 473-74. Hana testified that if she did not return to Iraq or her government employer discovered that she was attempting to emigrate to the United States, the Iraqi regime would threaten to hurt her family or prevent her from fleeing. *Id*. at 474. Two years later, Hana returned to the United States with a re-entry permit, intending to remain permanently in the United States and wait for her children to join her. *Id*. She brought with her over $10,000 in gold jewelry and money, with which she planned to purchase a home and car and help provide for her children when they arrived. *Id*. Two months later, however, Hana left for Iraq because of her mother-in-law's critical health condition, again obtaining a re-entry permit valid for two years. *Id*. Although Hana did not want to continue working in Iraq, she testified that she did so to provide for her family and because she feared for their safety when her employer contacted her and told her to return. *Id*. A year later, she attempted to leave Iraq for the United States but was turned back at the Iraqi border. *Id*. Hana traveled successfully to

the United States just under two years after she last left and two weeks before her re-entry permit was set to expire. *Id.* She had a ticket for a return flight to Jordan in four months but told immigration officials that she would not leave the United States unless she obtained another re-entry permit and that she planned to stay in the United States once her children received their visas. *Id.* Hana did not work, pay income taxes, or own property in the United States. *Id.* at 474-75.

Although the IJ ruled that Hana's trips to Iraq were "temporary visits abroad," the Board vacated that decision and ordered Hana deported to Iraq. *Id.* at 475. The Board held that Hana abandoned her LPR status because she lived in the United States for only three months during the relevant four-and-a-half-year period and that she lived and worked in Iraq, where her family, permanent employment, and property were located. *Id.* It also found persuasive that Hana had no property, bank account, doctor, or driver's license in the United States, and that she did not pay taxes. *Id.*

We granted Hana's petition for review and vacated the Board's decision, holding that the evidence was insufficient to support the Board's ruling that Hana abandoned her LPR status. *Id.* at 476. Although we acknowledged that, "in many cases the[] factors [upon which the Board relied] would rightly counsel in favor of finding that [Hana] had abandoned her LPR status," we held that "they do not lead to that conclusion in this case, where it is clear that Hana's failure to put down roots in the United States was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law." *Id.* at 477. We also found it persuasive that Hana was told that her children would be granted visas within three years, believed that she could travel between Iraq and the United States without losing her LPR status so long as she had unexpired re-entry permits, transported her valuables to the United States to "lay the foundation for her family's life in the United States," "inten[ded] all along . . . to facilitate her family members' joining her in the United States," ultimately succeeded in bringing her family to the United States solely because of her LPR status, did not intend her family to become permanent

residents without her, and spent most of her time in Iraq during the relevant period not for "convenience," but for "the safety and welfare of her family." *Id*. at 476-77.

Petitioners' reliance upon *Hana* is misplaced. When examined through the deferential lens required for the "intrinsically fact-specific" issues of abandonment and temporary visits, *see Chavez-Ramirez v. INS*, 792 F.2d 932, 935 (9th Cir. 1986), the evidence of record, as articulated accurately and analyzed thoroughly by the IJ and Board, supports their rulings that petitioner Karimijanaki abandoned her LPR status and did not take a temporary visit abroad. In contrast to *Hana*, Karimijanaki did not make any return trips to the United States during her more than seven-year absence from the United States even though her husband (and later, two of her children) were living, working, and studying in the United States, and she desired that three of her children (who had their immigrant visas) grow up and be schooled in their native country until they were of college age. Even when she returned to the United States in 2005, Karimijanaki had no intent to reside permanently in the United States; rather, she desired to travel to Iran to once again reside with her then 29-year-old adult daughter who was not living alone.

Unlike *Hana*, the record is devoid of evidence suggesting that Karimijanaki returned to Iran because she feared for her family's safety and welfare; rather, Karimijanaki attempted to justify her initial and intended returns based upon cultural forces that purportedly prohibited her unmarried adult daughter from living alone in Iran. However, we need not determine whether cultural reasons or traditions excuse an alien's extended absence from the United States and preserve her LPR status because the undisputed evidence in this case undermines the legitimacy of Karimijanaki's articulated rationale: she fails to explain why culture compelled her to return to Iran in 2005 when her daughter Zahra was not then living alone but was living with her aunt, and why she permitted her unmarried daughters to live and travel alone at various periods. She also does not adequately explicate why she took no affirmative steps within a seven-year period – such as obtaining re-entry permits or making a single visit to the United States – that might indicate her lack of intent to abandon her LPR status. Even assuming that

Karimijanaki intended to live abroad until her daughter obtained her immigrant visa or was married, we agree with the Board and IJ that the occurrence of these events was speculative and therefore lacked the "reasonable possibility" of occurring "within a short time period" required to qualify her seven-year absence as a "temporary visit abroad." We emphasize that had Congress "intended to allow permanent residents to reenter the United States and retain their status after 'all visits abroad that are not permanent' it could have done so." *Id.* at 936.

For these reasons, we hold that sufficient evidence supports the IJ's rulings, affirmed by the Board, that the government proved by clear and convincing evidence that Karimijanaki abandoned her LPR status and did not take a "temporary visit abroad" between 1997 and June 2005, and the evidence of record does not compel a contrary conclusion.

B.

The IJ, affirmed by the Board, imputed Karimijanaki's abandonment of her LPR status to her son, petitioner Nossoni, who was a sixteen-year-old unemancipated minor in June 2005. Although petitioners concede that petitioner Nossoni's parents' intent was properly imputable to him, they contend that the IJ erred in imputing the intent of his mother, who abandoned her LPR status, rather than the intent of his naturalized father. "Faced with two equally compelling intents," they argue, "the [Department of Homeland Security] could not meet its burden of proving that [petitioner Nossoni] abandoned his [LPR] status." Petitioners also complain that "[t]he agency chose the intent that will lead to the further separation of this family[,]" thereby contravening the law's purported purpose of encouraging "family unity."

Although we have not yet approved the imputation of a parent's abandonment of LPR status to the parent's unemancipated child, we now hold that such imputation may be allowed consistent with well-established authority. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) ("Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents."); *Singh v. Gonzales*, 451 F.3d 400, 409 (6th Cir. 2006)

(acknowledging the "BIA's history of imputing parents' . . . intent to abandon LPR status to their minor children")**4**; *Senica v. INS*, 16 F.3d 1013, 1016 (9th Cir. 1994) (holding that the BIA correctly imputed a parent's knowledge that she and her children were not eligible for entry to the United States to her children); *Nikoi v. Att'y Gen. of the U.S.*, 939 F.2d 1065, 1071 (D.C. Cir. 1991) (affirming district court's ruling that minors abandoned their permanent resident status during their "extended absence[s] from the United States while . . . in the custody and control of their parents" because it "comports with INS precedents, the regulations that codify them, and the general law governing the permanent residence of unemancipated minors"); *In re Escobar*, 24 I. & N. Dec. 231, 234 n.4 (BIA 2007) ("The imputation of a decision to abandon permanent resident status from a parent to a child is consistent with the above-mentioned longstanding policy that a child cannot form the intent necessary to establish his or her own domicile."); *Matter of Zamora*, 17 I. & N. Dec. 395, 397 (BIA 1980) ("To the extent that *Bauer* holds that an alien can escape the consequences of an 'entry' upon returning from such a long absence simply because he departed under the custody and control of his parents, it is hereby overruled.").

However, we have not yet addressed the crucial question regarding which parent's intent may be imputed to their unemancipated child when one parent has abandoned her LPR status but the other has not. In imputing Karimijanaki's abandonment of her LPR status to her son, the IJ and Board relied upon *Zamora*. *Zamora*, however, does not answer the question.

As the above-cited cases demonstrate, the imputation rule is based upon the policy that a child cannot legally form the intent necessary to establish his or her own domicile. The Restatement (Second) of Conflict of Laws § 22 cmt. d. (1971) provides that "[a] child's domicil, in the case of the . . . separation of his parents [where] . . . .there has been no legal fixing of custody, . . . is that of the parent with whom he lives . . . ."

---

**4**Although *Singh* held that parents' fraudulent conduct cannot be imputed to their children, it explained that "imputing fraudulent conduct – which necessarily includes both *knowledge* of falsity and an *intent to deceive*, . . . is a far cry from imputing knowledge of ineligibility for admission," or "imputing the intent to engage in a perfectly lawful act." *Singh*, 451 F.3d at 407.

*Cf.* 8 U.S.C. § 1431(a)(3) ("A child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled: . . . (3) The child is residing in the United States in the legal and *physical custody of the citizen parent* pursuant to a lawful admission for permanent residence.") (emphasis added.)

There is no dispute that during the relevant period from 1997 until June 2005, petitioner Hesameddin Nossoni lived with his mother in Iran and was, at all times, under her care and physical custody. Even when petitioner Nossoni and his mother returned to the United States in June 2005, he continued to live with his mother in Michigan while his father was living in California. There is no evidence in the record that petitioner Nossoni has *ever* lived with his father or has even had much contact with him. The only evidence of Ali Nossoni's physical connections to his son during the relevant period are his two approximately month-long visits to Iran over more than seven years and his attendance at the removability hearing (during which he did not testify). Based upon this evidence, petitioners' characterization of both parents' intent as "equally compelling" is inaccurate. Under these facts, the decision to impute Karimijanaki's abandonment of her LPR status rather than Ali Nossoni's citizenship to their son was reasonable. Petitioners' "family unity" argument is questionable because, although the immigration laws may share some of the blame for separating this family, it cannot be ignored that Ms. Karimijanaki and her husband have voluntarily chosen to live apart for reasons unrelated to immigration.

For these reasons, we hold that, based on this record, the IJ and Board did not err in imputing Karimijanaki's abandonment of her LPR status to her unemancipated minor son, petitioner Hesameddin Nossoni.

## C.

Finally, petitioners contend that petitioner Hesameddin Nossoni automatically acquired United States citizenship when his father was naturalized in April 2006, thereby mooting the agency's finding of abandonment and rendering him non-removable. The IJ ruled that petitioner Nossoni did not acquire citizenship derivatively upon his father's

naturalization because he did not, at that time or thereafter, reside in his father's physical custody and he had already abandoned his permanent residence. Although petitioners raised this issue in their appeal to the Board, the Board did not address it.

Generally, where an issue was ruled upon by the IJ and properly appealed to the Board but not addressed by the Board, the issue is not ripe for our review and should be remanded for the Board's consideration. *See Matovski v. Gonzales*, 492 F.3d 722, 740 (6th Cir. 2007) (citing *INS v. Ventura*, 537 U.S. 12, 16-17 (2002) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands . . . The agency can bring its expertise to bear upon the matter; it can evaluate the evidence; [and] it can make an initial determination.")). However, a remand is not required where such a gesture would be futile. *See Chen v. United States*, 471 F.3d 315, 339 (2d Cir. 2006) ("The overarching test for deeming a remand futile . . . is when the reviewing court can confidently predict that the agency would reach the same decision absent the errors that were made.") (citation and internal quotation marks omitted).

Under 8 U.S.C. § 1431(a)(3), "[a] child born outside of the United States automatically becomes a citizen of the United States when all of the following conditions have been fulfilled: . . . (3) The child is residing in the United States in the legal and physical custody of the citizen parent pursuant to a lawful admission for permanent residence." The IJ's ruling that petitioner Nossoni did not reside in his citizen father's physical custody at the time of his naturalization or at any time thereafter is a factual finding. The Board reviews factual findings for clear error, 8 C.F.R. § 1003.1(d)(3)(i), and we will not reverse unless a "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). As already discussed, petitioner Hesameddin Nossoni lived exclusively with his mother, and there was no evidence that he ever resided with his father. While petitioners assert that Ali Nossoni always retained legal custody over his son, they neither attempt to argue nor does the record support a finding that he resided with him at any relevant time. Therefore, petitioner Nossoni's right to derivative citizenship is purely a legal question, and we hold that the IJ did not

err in ruling that petitioner Nossoni did not acquire citizenship because he did not reside in his citizen father's physical custody at the time of his naturalization or at any time thereafter.[5]

III.

For these reasons, we deny the petition for review.

---

[5]Our holding renders moot petitioners' argument that the IJ erred in ruling that petitioner Nossoni abandoned his LPR status prior to the entry of a final administrative order of removal.