JANE B. STRANCH, Circuit Judge,
dissenting.
This case turns upon whether Lateef has abandoned her lawful permanent resident (LPR) status. Proving abandonment is a “heavy burden,” Hana v. Gonzales, 400 F.3d 472, 477 (6th Cir.2005), as the Government is required to prove that an LPR abandoned her status by “clear and convincing evidence,” Karimijanaki v. Holder, 579 F.3d 710, 715 (6th Cir.2009) (citing 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. *283 § 1240.8(a)). The LPR’s intent is measured by an objective standard and evaluated by her actions in light of the totality of the alien’s circumstances. Id. After a careful review of the record, I do not find that the evidence supports a determination of abandonment. I am particularly concerned that the majority denies the petition without acknowledging that much of Lateefs absence from the United States resulted from a United States immigration inspector’s erroneous refusal to issue proof of permanent resident status for Lateefs daughter when Lateef attempted to bring her into the country. I find it neither legally appropriate nor fair to make a finding of abandonment when several of Lateefs return trips to Pakistan upon which the majority relies to hold against her resulted from the error of United States immigration officials. I do not believe Lateef — along with her husband and two children, whose own LPR status is dependant upon Lateefs — should be punished for our government’s errors.
There are only two published Sixth Circuit decisions addressing abandonment of LPR status, Hana and Karimijanaki Abandonment was found in Karimijanaki but not in Hana. I respectfully dissent because I conclude this case falls squarely under Hana’s clear holding that LPRs may maintain their status when they remain abroad primarily for the purpose of providing necessary care to family members who expect to obtain permission to enter the United States within the next few years. 400 F.3d at 477.
In Hana, the petitioner was granted LPR status in May 1992 but returned to her native country of Iraq two months later to be with her family and help them prepare for their emigration, which she believed would take two years, as well as to avoid tipping off the Saddam Hussein regime to their plans. Id. at 474, 476. Hana returned to the United States in October 1994 — just before expiration of her re-entry permit — with $10,000 in valuables to give her brother for safekeeping and a purported intention to stay until her children arrived. Id. at 474. However, she left in December 1994 “in response to repeated telephone calls from her husband stressing her mother-in-law’s critical health condition.” Id. She resumed employment in Iraq out of fear of the regime as well as for living expenses. Id.
Hana did not return to the United States until December 1996 — again just before the expiration of her re-entry permit — although she claimed to have been stopped at the border on a previous attempt to leave in January 1996. Id. She did not attempt to return sooner because of her mother-in-law’s health and because she was waiting for a visa for her son, who arrived here in December 1995. Id. She was denied admission upon arrival. The Immigration Judge terminated exclusion proceedings after finding her trips to be “temporary visits abroad,” but the BIA vacated the decision and ordered Hana deported. Id.
In vacating the order of removal, this Court found it to be “obvious that Hana’s intent all along was to facilitate her family members’ joining her in the United States within a few short years, not to throw away [her] LPR status.” Id. at 476-77. This was the case despite the fact that she remained out of the United States for the “vast majority” of the four-and-a-half-year period in question (and continued her foreign employment) due to her care for her sick mother-in-law and desire to help her family prepare for emigration. Id. As the Hana court explained:
While in many cases these factors would rightly counsel in favor of finding that an alien had abandoned her LPR status, they do not lead to that conclusion in *284 this case, where it is clear that Hana’s failure to put down roots in the United States was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law. The evidence in this record demonstrates that Hana’s clear intent was “to return within a period relatively short, fixed by some early event” — the safe emigration of her family from Iraq, which she expected to occur anytime within three years. Indeed, to conclude — as did the Board — that Hana’s absence from the United States for most of the period in question evidences her intent to abandon her permanent resident status in the United States would require us also to conclude that Hana intended that her family should become permanent residents here without her. Nothing in this record supports such a conclusion.
Id. at 477. Thus, Hana established two distinct bases justifying an extended absence from the United States: helping loved ones flee a brutal regime and assisting in the care of a sick relative.
In Karimijanaki, the petitioner was absent from the United States for over seven years. Her stated purpose was to be with her eldest daughter in Iran because the daughter was too old to gain LPR status through her mother but was “culturally forbidden from living alone in Iran as an unmarried woman.” 579 F.3d at 712. However, we observed that “the undisputed evidence in this case undermines the legitimacy of Karimijanaki’s articulated rationale” because her daughter was living with her aunt in 2005 and her other unmarried daughters had previously lived and traveled alone. We also noted that, unlike in Hana, she took “no affirmative steps” to indicate her lack of intent to abandon LPR status, she did not make any return trips to the United States during the period, her husband (and later, two of her children) were living in the United States, and she admittedly had no intent to reside permanently in the United States when she attempted to make the re-entry at issue. Id. at 712, 718-19. Accordingly, this Court agreed with the BIA that “Karimijanaki abandoned her LPR status and did not take a ‘temporary visit abroad.’ ” Id. at 719.
In the instant ease, the majority explains that the holding in Hana was based on four factors: the petitioner (1) was told her family would obtain visas in a relatively short period of time, (2) made every effort to comply with the law, (3) had to return and remain in Iraq to protect her family from the regime and care for her terminally-ill mother-in-law, and (4) transferred assets to the United States to help her family transition to their new life.[1]
The majority concedes that the first factor — waiting for family members to obtain visas — is present here. Hana explicitly held that time spent abroad for this purpose — even if receipt of the visas is not expected for up to three years — constitutes “a period relatively short, fixed by some early event.” Hana, 400 F.3d at 476. Nonetheless, the majority somehow reaches the conclusion that all but one of Lateef s trips were not “for a period relatively short, fixed by some early event.” This erroneous determination is significant because the short period/fixed event test is not merely a factor in the totality-of-the-circumstances analysis; rather, it is one of the two determinative tests of whether an absence is a “temporary visit abroad” so as to permit re-entry of an LPR and foreclose *285 a determination of LPR abandonment. Hanoi, 400 F.3d at 476; Karimijanaki, 579 F.3d at 714-15.
While “appreciat[ing] the predicament which confronts immigrants who marry non-citizens abroad,” the majority relies on the Fifth Circuits decision in Moin v. Ashcroft for the proposition that such LPRs “must choose to live apart or risk losing their permanent resident status.” 335 F.3d 415, 421 (5th Cir.2003). However, Hana, which rejects this harsh standard and permits LPRs to live with their families while they await visas in compelling circumstances, is the controlling law of this Circuit. See United States v. McMurray, 653 F.3d 367, 383-84 (6th Cir.2011) (McKeague, J., dissenting) (discussing “our most fundamental principle of stare decisis ”). Nothing in Karimijanaki purported to limit this determination: Karimijanaki lost her status not because her reasons for remaining abroad were deemed insufficiently important but because “the undisputed evidence in this case undermines the legitimacy of Karimijanaki’s articulated rationale.” 579 F.3d at 719. This language obviously suggests that, as in Hana, there was some possible rationale which would have justified Karimijanaki’s absences. Cf Moin, 335 F.3d at 421.
The majority dismisses the next factor— compliance with the law — with the gross oversimplification that “Lateef made no attempt to comply with the law to maintain her LPR status.” Although the only affirmative legal compliance undertaken in Hana appears to be obtainment of reentry permits, such permits are not legally required. 8 U.S.C. § 1181(b). Indeed, it is the absence of such a permit or other documentation which generally triggers the abandonment inquiry in the first place. See Karimijanaki, 579 F.3d at 715. Nowhere in Hana did this Court hold that obtaining a re-entry permit was a dispositive factor. To the contrary — as indicated by the excerpt from Hana quoted by the majority on this issue — we relied on the petitioner’s subjective “impression” that the permit would allow her to maintain her status. Hana, 400 F.3d at 476. In Karimijanaki, this Court looked not just at whether the petitioner had obtained reentry permits but also whether she took “affirmative steps ... that might indicate her lack of intent to abandon her LPR status,” such as making visits to the United States. 579 F.3d at 719. Lateef made several visits and, as will be discussed in detail below, took many other actions that reveal her intention to permanently reside in this country.
I recognize that Lateef misled border officials by initially telling them upon her February 18, 2001 entry that she had last been in the United States in July 2000 instead of November 13, 1999, resulting in a purported absence of 202 days (assuming a July 31 departure) instead of the accurate total of 463 days. Aside from the fact that even the shorter period is above the 180-day window in which an LPR may safely be absent without needing re-admission, 8 U.S.C. § 1101(a)(13)(C)(ii), I fail to see how an event occurring quite literally after Lateefs absence should warrant a finding that she had ■previously intended to abandon her LPR status during that absence. Despite her dishonesty, Lateefs statement at the airport was at worst merely a reflection of her understanding after a long, tiring flight that her previous absence could trigger additional scrutiny into the reasons for her previous time abroad. As we review these reasons more than eleven years later, it appears to me that she was not mistaken.
While highlighting this single incident, the majority completely overlooks two significant attempts by Lateef to bring her *286 family to the United States in compliance with the law. First, Lateef sought a temporary visa for her husband to take one part of the Medical Licensing Examination with her in the United States in 1996, even obtaining a support letter from a congressman. Lateefs husband was denied a visitor visa by the State Department because he was deemed “an intending immigrant” as evidenced by the fact that “[his] wife, and his most important social tie, is a. permanent resident in the United States.” It is indisputably contradictory and, to my mind, a patent unfairness to first deny admission on the basis that Lateef and her husband intended to live in America and then, after they waited patiently to receive the proper immigrant visas, deny admission again on the basis that they lacked the intent to live in America during that time.
Second, Lateef attempted to bring her infant daughter to live with her permanently in the United States by obtaining a travel letter from the embassy in Pakistan. Although the record is somewhat unclear as to the subsequent events, it appears that, after Lateef and her daughter arrived in the United States, the immigration inspector erroneously refused to issue proof of permanent resident status for Lateefs daughter and instructed her to consult the INS. Lateef testified that the INS and a private attorney advised her to file an immigrant petition on her daughter’s behalf. After being told that it could take several years for her daughter to obtain permanent resident status and believing that her daughter was not entitled to stay in the United States during that time, Lateef took her daughter back to Pakistan.[2] The error of United States immigration officials caused this return trip and the subsequent return trips Lateef was required to take in order to care for her daughter. I do not understand how we can hold that times Lateef spent abroad as a result of our government’s error are proof that Lateef intended to abandon her LPR status, let alone categorically dismiss her as having “made no attempt to comply with the law to maintain her LPR status.”
As for the next factor — motivation for remaining abroad — the majority attempts to distinguish Lateefs motivation of alleged “convenience” with the Hana petitioner’s concern for “the safety and welfare of her family.” Lateef does not dispute that late-1990s Pakistan was not a brutal dictatorship like mid-1990s Iraq. She disputes, however, that conditions in Iraq were dispositive of our decision in Hana — accurately so because fear of the regime was only used to justify Hana’s first visit to Iraq. Hana, 400 F.8d at 474. The second trip was justified expressly by her “response to repeated telephone calls from her husband stressing her mother-in-law’s critical health condition.” Id. Fear of the regime was only used to explain why she returned to her Iraqi employment while already on her second trip. Id. We explained that, because “[Hana] was told that her children would be granted visas within three years,” she was permitted to “travel to Iraq to prepare her family members for their emigration.” Id. at 476. “[H]elping out with her sick mother-in-law and continuing her job” constituted “[p]art of that preparation.” Id.
The majority dismisses Lateefs decision to return to Pakistan to take care of her daughter with the terse conclusion that “Lateefs daughter had no medical problems.” I disagree and think that the *287 record compels a finding that Lateefs daughter experienced both emotional and physical problems that evidence a qualifying need for her mother’s care. A Pakistani doctor and Consultant Child Specialist wrote of Lateefs daughter:
Her family consulted me [a] few times besides her regular check ups in 1998 and 1999 for her behavioral problem whenever her mother left her in Pakistan. She could not adjust well without her mom and I advised the dad and family to reunite mother and child particularly in November 1999.
This is consistent with Lateefs testimony that she left the United States after hearing from her husband that their daughter “is not behaving as she has been when [Lateef was] there with, with her. She is crying most of the time, not showing any interest in anything. She was not eating right.” Lateef explained: “So that was very concerning for me, so that’s when I decided that it will be too much for her to go through all that.” Lateefs daughter “was very happy” when she returned, although “it took her some time to get back ... to her normal self.” However, when Lateef returned to the United States again, “the same thing happened with her, so then I have to go back again for her.” Similarly, Lateefs husband testified:
[W]ithin one day [of Lateefs absence] she was, she was not the same child. She was behaving totally differently. And she was not eating, not smiling, crying, where is mom, when mom is coming. We could not explain to her all these things and I try not to tell my wife in first couple of days....
And she has to come back, because I guess no mother can stay like that because she can — I, I don’t know. She’s— it’s very hard for any mother, I guess, even it’s hard for me to, to satisfy her, because — I mean, as a [father] I tried my best, because she was my daughter, but, you know, she spend most of her time -with mother. Even we played — I mean, like father, child, during that two, three months after March, but she was not as bonded with me as she was with the mother.
These facts are in stark contrast to Karimijanaki, in which all but one family member did have permission to be in the United States and there was found to be no valid justification for the petitioner to remain in Iran with the remaining non-admitted adult daughter. 579 F.3d at 718-19.
I fail to understand how intent to abandon LPR status is demonstrated by returning to care for a child experiencing what the record establishes to be behavior problems that include significant emotional and physical issues. Viewed objectively from the standpoint of a reasonable parent, I find Lateefs response to her infant daughter’s problems a more persuasive reason to return to provide care than the reason found acceptable in Hava, the assistance of the LPR’s husband with his terminally-ill mother. Cf. Hana, 400 F.3d at 476-77. If the latter is an accepted standard, then we must recognize that Lateef justified one of her return trips partially on the need to care for her ailing grandmother, who passed away just one month after Lateef arrived. Lateefs husband testified about the circumstances surrounding this trip to Pakistan:
So doctors told her family that she is in her kind of terminal stages, anytime, one month, six weeks, we don’t know [when] she may pass. So if you have any wish, any family to — you know, you can submit — we don’t have a hospice system in Pakistan. I mean, now I know it’s a beautiful system here in States. We don’t have anything. So the doctor just refuse, so they brought her *288 back to home with catheter, with IV fluid and ... she was catheterize all the time, kind of semi-comatose, come out here and there. So when my, my mother-in-law’s brother told [Lateef] that this is the condition. So [Lateef] said, I have to come, I can’t wait.
Far from being “motivated by convenience,” I believe the record makes clear that Lateef was “clearly motivated by the safety and welfare of her family” when she made her visits to Pakistan Id. at 477.
In regard to the final factor — steps to transition to life in America — the majority states: “Lateef did not transfer assets to the U.S. to help facilitate her family’s emigration to a new life.” Again, the majority ignores significant portions of the record. The petitioner in Hana “brought with her from Iraq over $10,000 in gold jewelry and money, which she gave to her brother in Michigan, so that she could purchase a home and a car and help provide for her children when they arrived in the United States.” Id. at 474. As an initial matter, Lateef came to the United States in 1991 with her parents and siblings when she was twenty-one years old, so it is unclear what assets, if any, Lateef may have possessed in 2001 that were not already in this country. In fact, Lateef stated in an affidavit that she brought jewelry “worth about $14,000” into the United States in 1995 after getting married.
The most important evidence of intent to make a home in America is largely ignored by the majority. Lateef and her husband expended considerable time and money to find lasting, gainful employment in the United States. She came here in March 1996 to take Step One of the United States Medical Licensing Examination. This is the required test to practice medicine in America, and the Government has not contested Lateefs assertion that passing it provides no benefits outside this country. Later that year during a trip abroad, Lateef and her husband traveled to Thailand to take Step Two because it was not offered in Pakistan and they wanted to take the test together. After being unsuccessful on her first try, Lateef retook that portion of the test in the United States in August 1997. She also traveled to America in June 1998 to apply for residency programs, January 1999 to take a naturalization exam, and October 1999 in anticipation of receiving job interviews. She and her husband each spent $6,000-$7,000 on licensing, certification, and testing fees, and she sent out 60-100 job applications to different hospitals. I believe this factor weighs far heavier against abandonment than the mere transportation of valuables to America in Hana, a factor which Lateef also independently satisfies. Hana’s valuables could have easily been transported back out of the United States, but the great cost and effort undertaken by Lateef and her husband to secure a new life in America would serve absolutely no benefit to a future life in Pakistan (or any other country).
As in Hana, the record here clearly demonstrates that Lateefs “intent all along was to facilitate her family members’ joining her in the United States within a few short years” under the totality of the circumstances. Id. at 476-77. It defies reason to conclude that Lateef, along with her husband, would have undertaken such onerous steps and expended so much time and money throughout the time period in question if she had abandoned her intent to remain an LPR. See Karimijanaki, 579 F.3d at 715 (stating that courts must consider relevant evidence to evaluate an alien’s intent under an objective standard); Hana, 400 F.3d at 476 (stating that factors such as length of time abroad and location of alien’s family should not be considered “to the exclusion of other evidence in the *289 record demonstrating the alien’s intent with regard to maintaining her LPR status.”). “[I]t is certainly worth noting that [Lateef s] efforts to bring her family to the United States were ultimately successful,” Hana, 400 F.3d at 477, and they arrived together in the United States shortly after Lateef s husband and children obtained visas.[3]
Looking closely at the entire record under the totality of the circumstances, considering this Court’s binding precedent, and remembering “the [Government’s] heavy burden in proving abandonment,” I conclude that “[t]he record before us compels a finding that there is not clear, unequivocal, and convincing evidence that [Lateefs] trips to [Pakistan] constitute abandonment of her LPR status.” See id. The majority determines, instead, that throughout the time Lateef was abroad providing necessary care to family members and awaiting permission for them to enter the United States — time during which she was preparing for a new life here by, among other actions, obtaining the necessary qualifications applicable only to a medical career here and applying for jobs here — she was doing so with the intention of abandoning her LPR status. That makes no sense. The majority’s reasoning leads to precisely the same absurd conclusion we rejected in Hana: that Lateef had undertaken all these activities while at the same time intending “that her family should become permanent residents here without her.” Id. In Hana, (now Chief) Judge Batchelder succinctly rejected such a finding, noting “[n]othing in this record supports such a conclusion” and emphasizing the point by explaining that “the alien’s intent cannot be examined in a vacuum that turns a blind eye to the circumstances he faces.” Id. Likewise here, the record does not support such a conclusion and the majority achieves its result only by turning a “blind eye” to the circumstances and record before us. Accordingly, I respectfully dissent.

. I take no position as to whether this four-factor analysis is sufficient to compare Hana and apply it only to address the majority’s reasoning.

. Although there was some debate at oral argument about what Lateef should have done in this situation, two immigration attorneys and three federal judges were unable to reach a consensus solution.

. The majority suggests the fact that Lateef and her family waited three months after the visas were issued in November 2000 to attend two family weddings in November 2000 and January 2001 before coming to the United States is evidence that the entire stay was open-ended. However, the weddings themselves presumably constituted events for which Lateef and her family could have temporarily traveled to Pakistan, so it seems unreasonable to expect them to come to the United States immediately after receiving their visas only to visit Pakistan shortly thereafter, return to the United States, and then briefly visit Pakistan again one month later. Significantly, they came to the United States within a few weeks of the latter wedding.