RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

HUMAIRA KHALID LATEEF; MUHAMMAD
NADEEM ASLAM; MAHEEN NADEEM;
DANIYAL MUHAMMAD NADEEM,

                    _Petitioners,_

          _v._

ERIC H. HOLDER, JR.,

                    _Respondent._

No. 10-3354

On Petition for Review of
Decision of the Board of Immigration Appeals.
Nos. A047 703 238; A047 703 237; A047 703 236; A042 984 748.

Argued: December 1, 2011

Decided and Filed:  June 26, 2012

Before:  SILER, McKEAGUE, and STRANCH, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Russell Reid Abrutyn, MARSHAL E. HYMAN & ASSOC., PC, Troy, Michigan, for Petitioners.  Julie M. Iversen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:** Russell Reid Abrutyn, Marshal E. Hyman, MARSHAL E. HYMAN & ASSOC., PC, Troy, Michigan, for Petitioners.  Julie M. Iversen, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

      SILER, J., delivered the opinion of the court, in which McKEAGUE, J., joined. STRANCH, J. (pp. 13–23), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

SILER, Circuit Judge.   Petitioners Humaira Lateef, her husband and minor children petition for review of an order by the Board of Immigration Appeals (BIA) that held that Lateef had abandoned her lawful permanent resident (LPR) status, which was imputed to her daughter and served as the foundation to deny her husband and other child entry into the United States.   Lateef argues that while she spent the majority of her time in her native country after she became a LPR, she never abandoned her status.   For the following reasons, we deny this petition for review.

I.

A.

Lateef is a native of Pakistan and became a LPR in June 1991 when she moved to the United States with her parents and brothers.   Two months later she returned to Pakistan to complete her final two years of medical school because U.S. medical schools would require her to completely restart her education.   After finishing medical school in Pakistan, she returned to the U.S. in May 1993 with a valid reentry permit.[1]   Then she remained in the U.S. for over two years.

Subsequently, Lateef began to spend the vast majority of her time in Pakistan. She returned to Pakistan in June 1995 to marry her husband.   She returned to the U.S. nine months later, in March 1996, and took part one of the exam to practice medicine in the U.S.   Her husband also applied for an entry visa.   Lateef and her husband believed it would be granted in a relatively short period of time.   Lateef returned to Pakistan five months later in August 1996.   She became pregnant with her daughter shortly after her arrival and took part two of the U.S. medical exam.

——————————————

[1]"A permanent resident . . . in possession of a valid reentry permit who is otherwise admissible shall not be deemed to have abandoned status based solely on the duration of an absence or absences while the permit is valid."   8 C.F.R. § 223.3(d)(1).

Lateef remained in Pakistan for just over a year and returned to the U.S. with her daughter in August 1997. Lateef did not return to the U.S. earlier because her doctor advised her not to fly during her pregnancy. Her daughter was granted LPR status as "a child born during [a] temporary visit abroad" to an LPR. 8 C.F.R. § 211.1(b)(1). During her over six-month stay in the U.S., Lateef retook part two of the medical exam because she failed her previous attempt. She also filed an application for naturalization but subsequently withdrew it because she had not been in the U.S. the requisite number of days. Lateef then returned to Pakistan in March 1998 to see her husband. She stayed in Pakistan for over three months before returning to the U.S. for thirteen days to apply for medical residency positions in June 1998.

After staying in the U.S. thirteen days, in July 1998 Lateef returned to Pakistan for six months. Lateef stated she had to return to Pakistan because her daughter missed her and, even though her daughter was not ill, she was developing behavioral problems. Lateef stayed in Pakistan to help plan her brother's wedding and later returned to the U.S. in January 1999 for twenty days to take her naturalization exam. In February 1999, she returned to Pakistan for nearly nine months. In October 1999, Lateef returned to the U.S. for two weeks in anticipation of receiving offers to interview for residency positions, but she returned to Pakistan in November 1999 due to her daughter's continuing behavioral problems.

Lateef remained in Pakistan for a year and three months without any definite plans of returning to the U.S. She only knew that she wanted to return "as soon as possible." But when Lateef's husband and children[2] were granted immigrant visas in November 2000, they stayed in Pakistan until February 2001 to attend weddings.

Lateef and her family attempted to enter the U.S. in February 2001. Even though she had not been in the U.S. since November 1999, Lateef told an officer with the former

---

[2]Lateef gave birth to her son in May 2000.

Immigration and Naturalization Service (INS)[3] that she was last in the U.S. in July 2000, but the passport did not corroborate Lateef's statement. Lateef stated that the previous INS officer she saw in July 2000 must have forgotten to stamp her passport. Nevertheless, Lateef and her family were referred for secondary immigration inspection.

During the secondary screening Lateef admitted the truth. After changing her story that she had last been in the U.S. in April 2000, the INS officials confronted Lateef with documents found in the family's luggage. When confronted with this evidence, Lateef admitted that she had not been in the U.S. since November 1999 and that she lied to the INS officials because she knew she had been traveling abroad for more than a year.

Lateef's only ties to the U.S. are her LPR parents and brothers. Prior to her arrival in Feburary 2001, she had never been employed or owned property in the U.S.

Lateef made seven trips to Pakistan during the approximately 116 months after she immigrated to the U.S. Over the course of that 116 months after she first arrived in the U.S. until her encounter with INS in February 2001, she spent thirty-five percent of her time in the U.S. (40 months) and sixty-five percent of her time in Pakistan (76 months).

B.

Removal proceedings against Lateef and her family began in June 2001. All Petitioners were charged with attempting to enter the U.S. without valid documentation in violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I). Lateef was also charged with misrepresenting a material fact to enter the U.S., in violation of 8 U.S.C. § 1182(a)(6)(C)(i), and her husband was charged with attempting to enter the U.S. to work without certification from the Department of Labor, in violation of 8 U.S.C.

---

[3]On March 1, 2003, the INS ceased to exist and its functions were transferred to the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub.L. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. § 101, *et seq.*). Since the relevant events in this case occurred before this change took effect, we refer to the INS as the germane government agency.

§ 1182(a)(5)(A).  The only issue that Lateef and her family contested was whether she had abandoned her LPR status.

In 2004, the Immigration Judge (IJ) ordered the Petitioners removed as charged. The IJ determined that Lateef had abandoned her LPR status; accordingly, the Petitioners were not entitled to immigrant visas.  The BIA subsequently affirmed the IJ's decision without opinion.

On appeal to this court, we remanded to the BIA for it to consider Lateef's arguments regarding her daughter's immigration status and how this may impact its decision that Lateef had abandoned her LPR status.  The BIA vacated its earlier decision and remanded the case to the IJ for further factual inquiry on these issues.

In 2008, the IJ sustained the removal of all Petitioners as charged.  The IJ held that once Lateef had abandoned her LPR status it was imputed to her daughter.  Also, the IJ denied Lateef's new application for a waiver of inadmissibility due to her material misrepresentation, under 8 U.S.C. § 1182(I).

Petitioners appealed the IJ's decision to the BIA and raised new issues for appeal. In addition to their arguments that Lateef had not abandoned her LPR status and that her daughter maintained her LPR status, Petitioners raised the arguments that Lateef's husband was not inadmissible to the U.S. under 8 U.S.C. § 1182(a)(5)(A), that Lateef's husband and children were granted visas as LPRs pursuant to 8 C.F.R. § 1205.1(a)(3) before she was deemed to have abandoned her LPR status and therefore remain admissible to the U.S., and that Lateef is not inadmissible to the U.S. under 8 U.S.C. § 1182(a)(6)(C)(i).  They also presented their waiver argument.

The BIA affirmed the IJ's ruling.  The BIA also ruled that the Petitioners new arguments were not properly before it because they were not part of its limited remand order to the IJ and were not raised in their initial appeal.  Even so, the BIA affirmed the IJ's initial ruling that Lateef's husband was inadmissible to the U.S. under 8 U.S.C. § 1182(a)(5)(A) and that Lateef was inadmissible to the U.S. under 8 U.S.C. § 1182(a)(6)(C)(i).  The BIA also ruled that Lateef's husband's and children's visas

would be considered revoked "as of the date of [their] approval," pursuant to 8 C.F.R. § 1205.1(a), when it affirmed that Lateef had abandoned her LPR status. Accordingly, as a matter of law, Lateef's husband and children never had valid entry visas. The BIA did not specifically address Lateef's waiver argument. But since the IJ ruled that Lateef's material misstatement would be irrelevant if she had not abandoned her LPR status, the BIA indirectly affirmed the IJ's decision on Lateef's waiver argument when it ruled that the IJ correctly analyzed the abandonment issue.

## II.

Where, as here, the BIA affirms an IJ's ruling and adds its own comments, "we review both the IJ's decision and the [BIA's] additional remarks." *Karimijanaki v. Holder*, 579 F.3d 710, 714 (6th Cir. 2009) (citation omitted). "Questions of law involving immigration proceedings are reviewed *de novo*." *Ramaj v. Gonzales*, 466 F.3d 520, 527 (6th Cir. 2006). But we give deference to the BIA when it reasonably interprets immigration statutes and regulations. *Karimijanaki*, 579 F.3d at 714 (citations omitted).

The BIA's order will be upheld if it is supported by substantial evidence. *Id.* We cannot reverse the BIA's ruling just because we would have reached a different decision. *Id. See Hana v. Gonzales*, 400 F.3d 472, 475 (6th Cir. 2005) ("we may not reverse the [BIA] simply because we disagree with its understanding of the facts."). The BIA's ruling can only be reversed if the facts are so conclusive that "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). *See Hana*, 400 F.3d at 475 ("On judicial review of an order of removal, the Board's findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" (citing *Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001) (quoting 8 U.S.C. § 1252(b)(4)(B))). "Rather, we must find that the evidence compels a finding that the Board was wrong." *Hana*, 400 F.3d at 475.

An alien may live in the U.S. as an LPR. 8 U.S.C. § 1101(a)(20). A person with LPR status may temporarily leave the U.S. and maintain her LPR status if she has not abandoned her LPR status or has been away from the U.S. for more than 180 days.

8 U.S.C. § 1101(a)(13)(C)(i) & (ii); 22 C.F.R. § 42.22(a).  If the LPR's trip abroad is protracted, she is still admissible to the U.S. if "this was caused by reasons beyond [her] control and for which [she] was not responsible."  22 C.F.R. § 42.22(a)(3).

But if that person abandons her LPR status, the BIA may terminate her status with an order of removal.  *Karimijanaki*, 579 F.3d at 715; 8 C.F.R. § 1001.1(p); 8 U.S.C. § 1101(a)(47)(B)(I).  Termination of LPR status is effective upon entry of the BIA's final order of deportation.  8 C.F.R. § 1001.1(p); 8 U.S.C. § 1101(a)(47)(B)(i).

The government must prove that an LPR abandoned her status by clear and convincing evidence.  *Karimijanaki*, 579 F.3d at 715; 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a).

A person with LPR status may petition for entry visas for her family.  8 U.S.C. § 1154(a)(1)(A)(viii)(II)(B)(i)(I).  If a person's LPR status is terminated, then all visas that the person petitioned for are retroactively revoked.  8 C.F.R. § 1205.1(a)(3)(i)(J).  Anyone without a valid visa is inadmissible to the U.S.  8 U.S.C. § 1182(a)(7)(A)(i)(I).

An unemancipated child born to a person with LPR status, who is temporarily traveling outside the U.S., gains LPR status upon entry to the U.S. with her LPR parent.  8 C.F.R. § 211.1(b).  However, if the LPR parent of that unemancipated child abandons her LPR status then that abandonment is imputed to the child.  *Karimijanaki*, 579 F.3d at 719.

## III.

Whether Lateef and her family may lawfully enter the U.S. depends on her LPR status.  Lateef is not admissible to the U.S. if she abandoned her LPR status.  And if Lateef abandoned her LPR status, her family's visas are retroactively revoked.  Accordingly, this discussion will focus on Lateef's LPR status since it is indisputable that Lateef's misrepresentation would be immaterial, that her husband would not need a labor certificate, that her family's entry visas would be valid and that her daughter would maintain her LPR status if Lateef has not abandoned her LPR status.

A.

We examine "the totality of an alien's circumstances," *Hana,* 400 F.3d at 476, to determine if she has abandoned her LPR status, "including the location of the alien's family, property, and job, and of course the length of the alien's trip(s) abroad but also other evidence in the record demonstrating the alien's intent with regard to maintaining her LPR status." *Karimijanaki*, 579 F.3d at 715 (quotations and citation omitted).  "The alien's intent is measured by an objective standard." *Id.* (citing *Singh v. Reno*, 113 F.3d 1512, 1515 (9th Cir. 1997) ("An alien's desire to retain his status as a permanent resident, without more, is not sufficient; his actions must support his professed intent.")).  "However, an individual with LPR status may also abandon that status by unintentional acts." *Id*. (citing *In re Duarte*, 18 I. & N. Dec. 329, 332 n.3 (BIA 1982) ("Lawful permanent resident status may . . . be lost through abandonment, intentional or unintentional[.]")).

Whether an LPR's trip aboard is temporary depends on "if (a) it is for a relatively short period, fixed by some early event; or (b) . . . will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time." *Id*. (quotations and citations omitted).  *See also Hana*, 400 F.3d at 476 ("[W]hen the visit relies upon an event with a reasonable possibility of occurring within a short period of time . . . the intention of the visitor must still be to return within a period relatively short, fixed by some early event." (quotation and citation omitted)).

B.

When she attempted to enter the U.S. with her family in February 2001, Lateef did not own property or have a job in the U.S.  Her parents and brothers were in the U.S.  But the family members that Lateef had spent the majority of her time with since she initially immigrated to the U.S. were coming with her from Pakistan.  Indeed, Lateef spent approximately sixty-five percent of her time in Pakistan after she obtained her LPR status.

Looking "through the deferential lens required for the 'intrinsically fact-specific' issues of abandonment and temporary visits, the evidence of record, as articulated accurately and analyzed thoroughly by the IJ and [the BIA], supports their rulings that petitioner [Lateef] abandoned her LPR status and did not take a temporary visit abroad." *Karimijanaki*, 579 F.3d at 718 (citation omitted).

Although Lateef's initial trip abroad could be considered temporary because it ended upon the occurrence of an event, *i.e.*, her graduation from medical school, all of her subsequent trips abroad were not "for a relatively short period, fixed by some early event" or ended "upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time." *Id.* at 715 (quotations and citations omitted). Her final trip to Pakistan, which lasted a year and three months, shows that she abandoned her LPR status. The trip occurred because of her daughter's behavioral problems and ended three months after her family was granted entry visas even though she wanted to return to the U.S. "as soon as possible." This protracted journey abroad was over 180 days and "was [not] caused by reasons beyond [her] control." 8 U.S.C. § 1101(a)(13)(C)(ii); 22 C.F.R. § 42.22(a)(3).

Lateef argues that her case is like the situation in *Hana* where we ruled that the petitioner had not abandoned her LPR status. 400 F.3d at 473-74. The petitioner in *Hana* was an LPR from Iraq and made trips to her native country during the reign of Saddam Hussein. *Id.* at 474. Like Lateef, the petitioner in *Hana* spent the majority of her time in her native country, expressed a desire to emigrate to the U.S. with her family and believed her family's immigrant petitions would be granted in a relatively short period of time. *Id.*

But that is where the similarities end. The *Hana* petitioner was coerced into returning to Iraq by her government employer just two months after she emigrated to the U.S. and applied for LPR status for her family. *Id.* She stated that if she did not return when her employer summoned her that her children or other family members would be harmed. *Id.*

The *Hana* petitioner returned to the U.S. over two years later but shortly before her re-entry visa expired. *Id.* She brought $10,000 worth of valuables and cash with her to purchase a home and a car because she intended to remain in the U.S. and wait until her children were granted entry visas. *Id.* However, she returned to Iraq just two months later to help care for her terminally ill mother-in-law, but not without obtaining another re-entry visa before she left. *Id.*

The *Hana* petitioner attempted to return to the U.S. two years later but Iraqi officials would not allow her to leave the country. *Id.* However, she was able to return to the U.S. two weeks before her re-entry visa expired. *Id.* INS officials interviewed her and she stated that "she was returning because her re-entry permit was about to expire and she 'did not want to lose [her] green card.' She also stated that she had a ticket for a return flight . . ., but that she would not leave the [U.S.] unless she first obtained another re-entry permit." *Id.* But due to the length of her absence from the U.S. and the fact that, like Lateef, she had never worked in the U.S., owned property, or paid taxes, INS officials denied her admission to the U.S. because she had "relinquished her LPR status." *Id.* at 474-75.

The BIA noted that the *Hana* petitioner had only been in the U.S. three months in the over four-year period of time before the INS refused her admission into the country. *Id.* It held that she "'remained in Iraq for her convenience and choice, that she was not compelled to remain,'" and that the INS demonstrated that she had abandoned her LPR status. *Id.*

We reversed the BIA for several reasons. We acknowledged that the *Hana* petitioner was told her family would obtain visas in a relatively short period of time. *Id.* at 476. More importantly, we noted that she made every effort to comply with the law. *Id.* ("[S]he was clearly under the impression that so long as she returned to the [U.S.] before the expiration of her re-entry permit, she could travel to Iraq to prepare her family members for their emigration and not risk losing her cherished LPR status."). She had to return and remain in Iraq to protect her family from the brutality of the Hussein regime and care for her terminally ill mother-in-law. *Id.* at 476-77 (To keep her family

safe until they were granted entry into the U.S., the petitioner "continued her [government] job [] so that Saddam's henchman did not harm her family members on the eve of their emigration." "[I]t is clear that [the petitioner's] failure to put down roots in the [U.S.] was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law."). And she transferred her assets to the U.S. to help her family transition to their new life. *Id.* at 476 ("Another component was transporting her valuables to America so that she could lay the foundation for her family's life in the [U.S.].").

Only one of these factors is present in Lateef's petition. Lateef believed her family would be able to emigrate with her in a relatively short period of time. But Lateef made no attempt to comply with the law to maintain her LPR status. In fact, she lied to INS agents because she knew that she had broken U.S. immigration law. Pakistan is not a brutal dictatorship like Hussein's Iraq. Lateef's daughter had no medical problems and Lateef did not transfer assets to the U.S. to help facilitate her family's emigration to a new life. "Unlike [Lateef], who was traveling freely between two relatively safe democratic nations, [the *Hana* petitioner] was acting to protect her family from a dictatorial regime with an infamous human rights record." *Id*. at 477. "[W]hile [Lateef's] decision to spend most of [her] time abroad was arguably motivated by convenience, [the *Hana* petitioner's] similar decision was clearly motivated by the safety and welfare of her family." *Id.*

As in *Moin v. Ashcroft*, 335 F.3d 415, 420-21 (5th Cir. 2003), the evidence paints a "picture of a person living in Pakistan while taking a few rather short trips to the United States."

> We appreciate the predicament which confronts immigrants who marry non-citizens abroad. Because temporary visas are often unavailable and processing marital visas may take years, they must choose to live apart or risk losing their permanent resident status . . . . Nevertheless, we must be guided by the totality of the record . . . . From that perspective, we cannot say that the evidence is so compelling in [the petitioner's] favor that no reasonable person could have made the same findings and conclusions as the immigration judge.

*Id*. at 421 (citation omitted).  Likewise, in this case, the evidence is not so compelling to find that the BIA was wrong.

PETITION DENIED.

—————————

**DISSENT**

—————————

JANE B. STRANCH, Circuit Judge, dissenting.  This case turns upon whether Lateef has abandoned her lawful permanent resident (LPR) status.  Proving abandonment is a "heavy burden," *Hana v. Gonzales*, 400 F.3d 472, 477 (6th Cir. 2005), as the Government is required to prove that an LPR abandoned her status by "clear and convincing evidence," *Karimijanaki v. Holder*, 579 F.3d 710, 715 (6th Cir. 2009) (citing 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a)).  The LPR's intent is measured by an objective standard and evaluated by her actions in light of the totality of the alien's circumstances.  *Id.*  After a careful review of the record, I do not find that the evidence supports a determination of abandonment.  I am particularly concerned that the majority denies the petition without acknowledging that much of Lateef's absence from the United States resulted from a United States immigration inspector's erroneous refusal to issue proof of permanent resident status for Lateef's daughter when Lateef attempted to bring her into the country.  I find it neither legally appropriate nor fair to make a finding of abandonment when several of Lateef's return trips to Pakistan upon which the majority relies to hold against her resulted from the error of United States immigration officials.  I do not believe Lateef—along with her husband and two children, whose own LPR status is dependant upon Lateef's—should be punished for our government's errors.

There are only two published Sixth Circuit decisions addressing abandonment of LPR status, *Hana* and *Karimijanaki*.  Abandonment was found in *Karimijanaki* but not in *Hana.*  I respectfully dissent because I conclude this case falls squarely under *Hana*'s clear holding that LPRs may maintain their status when they remain abroad primarily for the purpose of providing necessary care to family members who expect to obtain permission to enter the United States within the next few years.  400 F.3d at 477.

In *Hana*, the petitioner was granted LPR status in May 1992 but returned to her native country of Iraq two months later to be with her family and help them prepare for

their emigration, which she believed would take two years, as well as to avoid tipping off the Saddam Hussein regime to their plans. *Id.* at 474, 476. Hana returned to the United States in October 1994—just before expiration of her re-entry permit—with $10,000 in valuables to give her brother for safekeeping and a purported intention to stay until her children arrived. *Id.* at 474. However, she left in December 1994 "in response to repeated telephone calls from her husband stressing her mother-in-law's critical health condition." *Id.* She resumed employment in Iraq out of fear of the regime as well as for living expenses. *Id.*

Hana did not return to the United States until December 1996—again just before the expiration of her re-entry permit—although she claimed to have been stopped at the border on a previous attempt to leave in January 1996. *Id.* She did not attempt to return sooner because of her mother-in-law's health and because she was waiting for a visa for her son, who arrived here in December 1995. *Id.* She was denied admission upon arrival. The Immigration Judge terminated exclusion proceedings after finding her trips to be "temporary visits abroad," but the BIA vacated the decision and ordered Hana deported. *Id.*

In vacating the order of removal, this Court found it to be "obvious that Hana's intent all along was to facilitate her family members' joining her in the United States within a few short years, not to throw away [her] LPR status." *Id.* at 476-77. This was the case despite the fact that she remained out of the United States for the "vast majority" of the four-and-a-half-year period in question (and continued her foreign employment) due to her care for her sick mother-in-law and desire to help her family prepare for emigration. *Id.* As the *Hana* court explained:

> While in many cases these factors would rightly counsel in favor of finding that an alien had abandoned her LPR status, they do not lead to that conclusion in this case, where it is clear that Hana's failure to put down roots in the United States was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law. The evidence in this record demonstrates that Hana's clear intent was "to

return within a period relatively short, fixed by some early event"—the safe emigration of her family from Iraq, which she expected to occur anytime within three years. Indeed, to conclude—as did the Board—that Hana's absence from the United States for most of the period in question evidences her intent to abandon her permanent resident status in the United States would require us also to conclude that Hana intended that her family should become permanent residents here without her. Nothing in this record supports such a conclusion.

*Id.* at 477. Thus, *Hana* established two distinct bases justifying an extended absence from the United States: helping loved ones flee a brutal regime and assisting in the care of a sick relative.

In *Karimijanaki*, the petitioner was absent from the United States for over seven years. Her stated purpose was to be with her eldest daughter in Iran because the daughter was too old to gain LPR status through her mother but was "culturally forbidden from living alone in Iran as an unmarried woman." 579 F.3d at 712. However, we observed that "the undisputed evidence in this case undermines the legitimacy of Karimijanaki's articulated rationale" because her daughter was living with her aunt in 2005 and her other unmarried daughters had previously lived and traveled alone. We also noted that, unlike in *Hana*, she took "no affirmative steps" to indicate her lack of intent to abandon LPR status, she did not make any return trips to the United States during the period, her husband (and later, two of her children) were living in the United States, and she admittedly had no intent to reside permanently in the United States when she attempted to make the re-entry at issue. *Id.* at 712, 718-19. Accordingly, this Court agreed with the BIA that "Karimijanaki abandoned her LPR status and did not take a 'temporary visit abroad.'" *Id.* at 719.

In the instant case, the majority explains that the holding in *Hana* was based on four factors: the petitioner (1) was told her family would obtain visas in a relatively short period of time, (2) made every effort to comply with the law, (3) had to return and remain in Iraq to protect her family from the regime and care for her terminally-ill

mother-in-law, and (4) transferred assets to the United States to help her family transition to their new life.[1]

The majority concedes that the first factor—waiting for family members to obtain visas—is present here.   *Hana* explicitly held that time spent abroad for this purpose—even if receipt of the visas is not expected for up to three years—constitutes "a period relatively short, fixed by some early event."   *Hana*, 400 F.3d at 476. Nonetheless, the majority somehow reaches the conclusion that all but one of Lateef's trips were *not* "for a period relatively short, fixed by some early event."  This erroneous determination is significant because the short period/fixed event test is not merely a factor in the totality-of-the-circumstances analysis; rather, it is one of the two determinative tests of whether an absence is a "temporary visit abroad" so as to permit re-entry of an LPR and foreclose a determination of LPR abandonment.  *Hana*, 400 F.3d at 476; *Karimijanaki*, 579 F.3d at 714-15.

While "appreciat[ing] the predicament which confronts immigrants who marry non-citizens abroad," the majority relies on the Fifth Circuits decision in *Moin v. Ashcroft* for the proposition that such LPRs "must choose to live apart or risk losing their permanent resident status."  335 F.3d 415, 421 (5th Cir. 2003).  However, *Hana*, which rejects this harsh standard and permits LPRs to live with their families while they await visas in compelling circumstances, is the controlling law of this Circuit.  *See United States v. McMurray*, 653 F.3d 367, 383-84 (6th Cir. 2011) (McKeague, J., dissenting) (discussing "our most fundamental principle of *stare decisis*").  Nothing in *Karimijanaki* purported to limit this determination: Karimijanaki lost her status not because her reasons for remaining abroad were deemed insufficiently important but because "the undisputed evidence in this case undermines the legitimacy of Karimijanaki's articulated rationale."  579 F.3d at 719.  This language obviously suggests that, as in *Hana*, there

---

[1] I take no position as to whether this four-factor analysis is sufficient to compare *Hana* and apply it only to address the majority's reasoning.

was some possible rationale which would have justified Karimijanaki's absences. *Cf.
Moin*, 335 F.3d at 421.

The majority dismisses the next factor—compliance with the law—with the gross
oversimplification that "Lateef made no attempt to comply with the law to maintain her
LPR status." Although the only affirmative legal compliance undertaken in *Hana*
appears to be obtainment of re-entry permits, such permits are not legally required.
8 U.S.C. § 1181(b). Indeed, it is the absence of such a permit or other documentation
which generally triggers the abandonment inquiry in the first place. *See Karimijanaki*,
579 F.3d at 715. Nowhere in *Hana* did this Court hold that obtaining a re-entry permit
was a dispositive factor. To the contrary—as indicated by the excerpt from *Hana* quoted
by the majority on this issue—we relied on the petitioner's subjective "impression" that
the permit would allow her to maintain her status. *Hana*, 400 F.3d at 476. In
*Karimijanaki*, this Court looked not just at whether the petitioner had obtained re-entry
permits but also whether she took "affirmative steps . . . that might indicate her lack of
intent to abandon her LPR status," such as making visits to the United States. 579 F.3d
at 719. Lateef made several visits and, as will be discussed in detail below, took many
other actions that reveal her intention to permanently reside in this country.

I recognize that Lateef misled border officials by initially telling them upon her
February 18, 2001 entry that she had last been in the United States in July 2000 instead
of November 13, 1999, resulting in a purported absence of 202 days (assuming a July
31 departure) instead of the accurate total of 463 days. Aside from the fact that even the
shorter period is above the 180-day window in which an LPR may safely be absent
without needing re-admission, 8 U.S.C. § 1101(a)(13)(C)(ii), I fail to see how an event
occurring quite literally after Lateef's absence should warrant a finding that she had
*previously* intended to abandon her LPR status during that absence. Despite her
dishonesty, Lateef's statement at the airport was at worst merely a reflection of her
understanding after a long, tiring flight that her previous absence could trigger additional

scrutiny into the reasons for her previous time abroad. As we review these reasons more than eleven years later, it appears to me that she was not mistaken.

While highlighting this single incident, the majority completely overlooks two significant attempts by Lateef to bring her family to the United States in compliance with the law. First, Lateef sought a temporary visa for her husband to take one part of the Medical Licensing Examination with her in the United States in 1996, even obtaining a support letter from a congressman. Lateef's husband was denied a visitor visa by the State Department because he was deemed "an intending immigrant" as evidenced by the fact that "[his] wife, and his most important social tie, is a permanent resident in the United States." It is indisputably contradictory and, to my mind, a patent unfairness to first deny admission on the basis that Lateef and her husband intended to live in America and then, after they waited patiently to receive the proper immigrant visas, deny admission again on the basis that they lacked the intent to live in America during that time.

Second, Lateef attempted to bring her infant daughter to live with her permanently in the United States by obtaining a travel letter from the embassy in Pakistan. Although the record is somewhat unclear as to the subsequent events, it appears that, after Lateef and her daughter arrived in the United States, the immigration inspector erroneously refused to issue proof of permanent resident status for Lateef's daughter and instructed her to consult the INS. Lateef testified that the INS and a private attorney advised her to file an immigrant petition on her daughter's behalf. After being told that it could take several years for her daughter to obtain permanent resident status and believing that her daughter was not entitled to stay in the Unites States during that time, Lateef took her daughter back to Pakistan.[2] The error of United States immigration officials caused this return trip and the subsequent return trips Lateef was required to take in order to care for her daughter. I do not understand how we can hold that times

---

[2] Although there was some debate at oral argument about what Lateef should have done in this situation, two immigration attorneys and three federal judges were unable to reach a consensus solution.

Lateef spent abroad as a result of our government's error are proof that Lateef intended to abandon her LPR status, let alone categorically dismiss her as having "made no attempt to comply with the law to maintain her LPR status."

As for the next factor—motivation for remaining abroad—the majority attempts to distinguish Lateef's motivation of alleged "convenience" with the *Hana* petitioner's concern for "the safety and welfare of her family." Lateef does not dispute that late-1990s Pakistan was not a brutal dictatorship like mid-1990s Iraq. She disputes, however, that conditions in Iraq were dispositive of our decision in *Hana*—accurately so because fear of the regime was only used to justify Hana's *first* visit to Iraq. *Hana*, 400 F.3d at 474. The *second* trip was justified expressly by her "response to repeated telephone calls from her husband stressing her mother-in-law's critical health condition." *Id.* Fear of the regime was only used to explain why she returned to her Iraqi employment while already on her second trip. *Id.* We explained that, because "[Hana] was told that her children would be granted visas within three years," she was permitted to "travel to Iraq to prepare her family members for their emigration." *Id.* at 476. "[H]elping out with her sick mother-in-law and continuing her job" constituted "[p]art of that preparation." *Id.*

The majority dismisses Lateef's decision to return to Pakistan to take care of her daughter with the terse conclusion that "Lateef's daughter had no medical problems." I disagree and think that the record compels a finding that Lateef's daughter experienced both emotional and physical problems that evidence a qualifying need for her mother's care. A Pakistani doctor and Consultant Child Specialist wrote of Lateef's daughter:

> Her family consulted me [a] few times besides her regular check ups in 1998 and 1999 for her behavioral problem whenever her mother left her in Pakistan. She could not adjust well without her mom and I advised the dad and family to reunite mother and child particularly in November 1999.

This is consistent with Lateef's testimony that she left the United States after hearing from her husband that their daughter "is not behaving as she has been when [Lateef was] there with, with her. She is crying most of the time, not showing any interest in

anything. She was not eating right." Lateef explained: "So that was very concerning for me, so that's when I decided that it will be too much for her to go through all that." Lateef's daughter "was very happy" when she returned, although "it took her some time to get back . . . to her normal self." However, when Lateef returned to the United States again, "the same thing happened with her, so then I have to go back again for her." Similarly, Lateef's husband testified:

> [W]ithin one day [of Lateef's absence] she was, she was not the same child. She was behaving totally differently. And she was not eating, not smiling, crying, where is mom, when mom is coming. We could not explain to her all these things and I try not to tell my wife in first couple of days. . . .
>
> And she has to come back, because I guess no mother can stay like that because she can—I, I don't know. She's—it's very hard for any mother, I guess, even it's hard for me to, to satisfy her, because—I mean, as a [father] I tried my best, because she was my daughter, but, you know, she spend most of her time with mother. Even we played—I mean, like father, child, during that two, three months after March, but she was not as bonded with me as she was with the mother.

These facts are in stark contrast to *Karimijanaki*, in which all but one family member did have permission to be in the United States and there was found to be no valid justification for the petitioner to remain in Iran with the remaining non-admitted adult daughter. 579 F.3d at 718-19.

I fail to understand how intent to abandon LPR status is demonstrated by returning to care for a child experiencing what the record establishes to be behavior problems that include significant emotional and physical issues. Viewed objectively from the standpoint of a reasonable parent, I find Lateef's response to her infant daughter's problems a more persuasive reason to return to provide care than the reason found acceptable in *Hana*, the assistance of the LPR's husband with his terminally-ill mother. *Cf. Hana*, 400 F.3d at 476-77. If the latter is an accepted standard, then we must recognize that Lateef justified one of her return trips partially on the need to care

for her ailing grandmother, who passed away just one month after Lateef arrived. Lateef's husband testified about the circumstances surrounding this trip to Pakistan:

> So doctors told her family that she is in her kind of terminal stages, anytime, one month, six weeks, we don't know [when] she may pass. So if you have any wish, any family to—you know, you can submit—we don't have a hospice system in Pakistan. I mean, now I know it's a beautiful system here in States. We don't have anything. So the doctor just refuse, so they brought her back to home with catheter, with IV fluid and . . . she was catheterize all the time, kind of semi-comatose, come out here and there. So when my, my mother-in-law's brother told [Lateef] that this is the condition. So [Lateef] said, I have to come, I can't wait.

Far from being "motivated by convenience," I believe the record makes clear that Lateef was "clearly motivated by the safety and welfare of her family" when she made her visits to Pakistan *Id.* at 477.

In regard to the final factor—steps to transition to life in America—the majority states: "Lateef did not transfer assets to the U.S. to help facilitate her family's emigration to a new life." Again, the majority ignores significant portions of the record. The petitioner in *Hana* "brought with her from Iraq over $10,000 in gold jewelry and money, which she gave to her brother in Michigan, so that she could purchase a home and a car and help provide for her children when they arrived in the United States." *Id.* at 474. As an initial matter, Lateef came to the United States in 1991 with her parents and siblings when she was twenty-one years old, so it is unclear what assets, if any, Lateef may have possessed in 2001 that were not already in this country. In fact, Lateef stated in an affidavit that she brought jewelry "worth about $14,000" into the United States in 1995 after getting married.

The most important evidence of intent to make a home in America is largely ignored by the majority. Lateef and her husband expended considerable time and money to find lasting, gainful employment in the United States. She came here in March 1996 to take Step One of the United States Medical Licensing Examination. This is the required test to practice medicine in America, and the Government has not contested

Lateef's assertion that passing it provides no benefits outside this country. Later that year during a trip abroad, Lateef and her husband traveled to Thailand to take Step Two because it was not offered in Pakistan and they wanted to take the test together. After being unsuccessful on her first try, Lateef retook that portion of the test in the United States in August 1997. She also traveled to America in June 1998 to apply for residency programs, January 1999 to take a naturalization exam, and October 1999 in anticipation of receiving job interviews. She and her husband each spent $6,000-$7,000 on licensing, certification, and testing fees, and she sent out 60-100 job applications to different hospitals. I believe this factor weighs far heavier against abandonment than the mere transportation of valuables to America in *Hana,* a factor which Lateef also independently satisfies. Hana's valuables could have easily been transported back out of the United States, but the great cost and effort undertaken by Lateef and her husband to secure a new life in America would serve absolutely no benefit to a future life in Pakistan (or any other country).

As in *Hana*, the record here clearly demonstrates that Lateef's "intent all along was to facilitate her family members' joining her in the United States within a few short years" under the totality of the circumstances. *Id*. at 476-77. It defies reason to conclude that Lateef, along with her husband, would have undertaken such onerous steps and expended so much time and money throughout the time period in question if she had abandoned her intent to remain an LPR. *See Karimijanaki*, 579 F.3d at 715 (stating that courts must consider relevant evidence to evaluate an alien's intent under an objective standard); *Hana*, 400 F.3d at 476 (stating that factors such as length of time abroad and location of alien's family should not be considered "to the exclusion of other evidence in the record demonstrating the alien's intent with regard to maintaining her LPR status."). "[I]t is certainly worth noting that [Lateef's] efforts to bring her family to the

22

United States were ultimately successful," *Hana*, 400 F.3d at 477, and they arrived together in the United States shortly after Lateef's husband and children obtained visas.[3]

Looking closely at the entire record under the totality of the circumstances, considering this Court's binding precedent, and remembering "the [Government's] heavy burden in proving abandonment," I conclude that "[t]he record before us compels a finding that there is not clear, unequivocal, and convincing evidence that [Lateef's] trips to [Pakistan] constitute abandonment of her LPR status." *See id.* The majority determines, instead, that throughout the time Lateef was abroad providing necessary care to family members and awaiting permission for them to enter the United States—time during which she was preparing for a new life here by, among other actions, obtaining the necessary qualifications applicable only to a medical career here and applying for jobs here—she was doing so with the intention of abandoning her LPR status. That makes no sense. The majority's reasoning leads to precisely the same absurd conclusion we rejected in *Hana*: that Lateef had undertaken all these activities while at the same time intending "that her family should become permanent residents here without her." *Id.* In *Hana*, (now Chief) Judge Batchelder succinctly rejected such a finding, noting "[n]othing in this record supports such a conclusion" and emphasizing the point by explaining that "the alien's intent cannot be examined in a vacuum that turns a blind eye to the circumstances he faces." *Id.* Likewise here, the record does not support such a conclusion and the majority achieves its result only by turning a "blind eye" to the circumstances and record before us. Accordingly, I respectfully dissent.

---

[3]The majority suggests the fact that Lateef and her family waited three months after the visas were issued in November 2000 to attend two family weddings in November 2000 and January 2001 before coming to the United States is evidence that the entire stay was open-ended. However, the weddings themselves presumably constituted events for which Lateef and her family could have temporarily traveled to Pakistan, so it seems unreasonable to expect them to come to the United States immediately after receiving their visas only to visit Pakistan shortly thereafter, return to the United States, and then briefly visit Pakistan again one month later. Significantly, they came to the United States within a few weeks of the latter wedding.