SILER, J., delivered the opinion of the court, in which McKEAGUE, J., joined. STRANCH, J. (pp. 282-89), delivered a separate dissenting opinion.
OPINION
SILER, Circuit Judge.
Petitioners Humaira Lateef, her husband and minor children petition for review of an order by the Board of Immigration Appeals (BIA) that held that Lateef had abandoned her lawful permanent resident (LPR) status, which was imputed to her daughter and served as the foundation to deny her husband and other child entry into the United States. Lateef argues that while she spent the majority of her time in her native country after she became a LPR, she never abandoned her status. For the following reasons, we deny this petition for review.
I.
A.
Lateef is a native of Pakistan and became a LPR in June 1991 when she moved to the United States with her parents and brothers. Two months later she returned to Pakistan to complete her final two years of medical school because U.S. medical schools would require her to completely restart her education. After finishing medical school in Pakistan, she returned to the U.S. in May 1993 with a valid reentry *277 permit.[1] Then she remained in the U.S. for over two years.
Subsequently, Lateef began to spend the vast majority of her time in Pakistan. She returned to Pakistan in June 1995 to marry her husband. She returned to the U.S. nine months later, in March 1996, and took part one of the exam to practice medicine in the U.S. Her husband also applied for an entry visa. Lateef and her husband believed it would be granted in a relatively short period of time. Lateef returned to Pakistan five months later in August 1996. She became pregnant with her daughter shortly after her arrival and took part two of the U.S. medical exam.
Lateef remained in Pakistan for just over a year and returned to the U.S. with her daughter in August 1997. Lateef did not return to the U.S. earlier because her doctor advised her not to fly during her pregnancy. Her daughter was granted LPR status as “a child born during [a] temporary visit abroad” to an LPR. 8 C.F.R. § 211.1(b)(1). During her over six-month stay in the U.S., Lateef retook part two of the medical exam because she failed her previous attempt. She also filed an application for naturalization but subsequently withdrew it because she had not been in the U.S. the requisite number of days. Lateef then returned to Pakistan in March 1998 to see her husband. She stayed in Pakistan for over three months before returning to the U.S. for thirteen days to apply for medical residency positions in June 1998.
After staying in the U.S. thirteen days, in July 1998 Lateef returned to Pakistan for six months. Lateef stated she had to return to Pakistan because her daughter missed her and, even though her daughter was not ill, she was developing behavioral problems. Lateef stayed in Pakistan to help plan her brother’s wedding and later returned to the U.S. in January 1999 for twenty days to take her naturalization exam. In February 1999, she returned to Pakistan for nearly nine months. In October 1999, Lateef returned to the U.S. for two weeks in anticipation of receiving offers to interview for residency positions, but she returned to Pakistan in November 1999 due to her daughter’s continuing behavioral problems.
Lateef remained in Pakistan for a year and three months without any definite plans of returning to the U.S. She only knew that she wanted to return “as soon as possible.” But when Lateef s husband and children[2] were granted immigrant visas in November 2000, they stayed in Pakistan until February 2001 to attend weddings.
Lateef and her family attempted to enter the U.S. in February 2001. Even though she had not been in the U.S. since November 1999, Lateef told an officer with the former Immigration and Naturalization Service (INS)[3] that she was last in the U.S. in July 2000, but the passport did not corroborate Lateefs statement. Lateef stated that the previous INS officer she saw in July 2000 must have forgotten to stamp her passport. Nevertheless, La *278 teef and her family were referred for secondary immigration inspection.
During the secondary screening Lateef admitted the truth. After changing her story that she had last been in the U.S. in April 2000, the INS officials confronted Lateef with documents found in the family’s luggage. When confronted with this evidence, Lateef admitted that she had not been in the U.S. since November 1999 and that she lied to the INS officials because she knew she had been traveling abroad for more than a year.
Lateefs only ties to the U.S. are her LPR parents and brothers. Prior to her arrival in February 2001, she had never been employed or owned property in the U.S.
Lateef made seven trips to Pakistan during the approximately 116 months after she immigrated to the U.S. Over the course of that 116 months after she first arrived in the U.S. until her encounter with INS in February 2001, she spent thirty-five percent of her time in the U.S. (40 months) and sixty-five percent of her time in Pakistan (76 months).
B.
Removal proceedings against Lateef and her family began in June 2001. All Petitioners were charged with attempting to enter the U.S. without valid documentation in violation of 8 U.S.C. § 1182(a)(7) (A) (i)(I). Lateef was also charged with misrepresenting a material fact to enter the U.S., in violation of 8 U.S.C. § 1182(a)(6)(C)(i), and her husband was charged with attempting to enter the U.S. to work without certification from the Department of Labor, in violation of 8 U.S.C. § 1182(a)(5)(A). The only issue that Lateef and her family contested was whether she had abandoned her LPR status.
In 2004, the Immigration Judge (IJ) ordered the Petitioners removed as charged. The IJ determined that Lateef had abandoned her LPR status; accordingly, the Petitioners were not entitled to immigrant visas. The BIA subsequently affirmed the IJ’s decision without opinion.
On appeal to this court, we remanded to the BIA for it to consider Lateefs arguments regarding her daughter’s immigration status and how this may impact its decision that Lateef had abandoned her LPR status. The BIA vacated its earlier decision and remanded the case to the IJ for further factual inquiry on these issues.
In 2008, the IJ sustained the removal of all Petitioners as charged. The IJ held that once Lateef had abandoned her LPR status it was" imputed to her daughter. Also, the IJ denied Lateefs new application for a waiver of inadmissibility due to her material misrepresentation, under 8 U.S.C. § 1182(1).
Petitioners appealed the IJ’s decision to the BIA and raised new issues for appeal. In addition to their arguments that Lateef had not abandoned her LPR status and that her daughter maintained her LPR status, Petitioners- raised the arguments that Lateefs husband was not inadmissible to the U.S. under 8 U.S.C. § 1182(a)(5)(A), that Lateefs husband and children were granted visas as LPRs pursuant to 8 C.F.R. § 1205.1(a)(3) before she was deemed to have abandoned her LPR status and therefore remain admissible to the U.S., and that Lateef is not inadmissible to the U.S. under 8 U.S.C. § 1182(a)(6)(C)(i). They also presented their waiver argument.
The BIA affirmed the IJ’s ruling. The BIA also ruled that the Petitioners new arguments were not properly before it because they were not part of its limited remand order to the IJ and were not raised in their initial appeal. Even so, the *279 BIA affirmed the IJ’s initial ruling that Lateefs husband was inadmissible to the U.S. under 8 U.S.C. § 1182(a)(5)(A) and that Lateef was inadmissible to the U.S. under 8 U.S.C. § 1182(a)(6)(C)(i). The BIA also ruled that Lateefs husband’s and children’s visas would be considered revoked “as of the date of [their] approval,” pursuant to 8 C.F.R. § 1205.1(a), when it affirmed that Lateef had abandoned her LPR status. Accordingly, as a matter of law, Lateefs husband and children never had valid entry visas. The BIA did not specifically address Lateefs waiver argument. But since the IJ ruled that Lateefs material misstatement would be irrelevant if she had not abandoned her LPR status, the BIA indirectly affirmed the IJ’s decision on Lateefs waiver argument when it ruled that the IJ correctly analyzed the abandonment issue.
II.
Where, as here, the BIA affirms an IJ’s ruling and adds its own comments, “we review both the IJ’s decision and the [BIA’s] additional remarks.” Karimijanaki v. Holder, 579 F.3d 710, 714 (6th Cir.2009) (citation omitted). “Questions of law involving immigration proceedings are reviewed de novo.” Ramaj v. Gonzales, 466 F.3d 520, 527 (6th Cir.2006). But we give deference to the BIA when it reasonably interprets immigration statutes and regulations. Karimijanaki, 579 F.3d at 714 (citations omitted).
The BIA’s order will be upheld if it is supported by substantial evidence. Id. We cannot reverse the BIA’s ruling just because we would have reached a different decision. Id. See Hana v. Gonzales, 400 F.3d 472, 475 (6th Cir.2005) (“we may not reverse the [BIA] simply because we disagree with its understanding of the facts.”). The BIA’s ruling can only be reversed if the facts are so conclusive that “any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B). See. Hana, 400 F.3d at 475 (“On judicial review of an order of removal, the Board’s findings of fact are ‘conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.’ ”) (citing Ali v. Reno, 237 F.3d 591, 596 (6th Cir.2001) (quoting 8 U.S.C. § 1252(b)(4)(B))). “Rather, we must find that the evidence compels a finding that the Board was wrong.” Hana, 400 F.3d at 475.
An alien may live in the U.S. as an LPR. 8 U.S.C. § 1101(a)(20). A person with LPR status may temporarily leave the U.S. and maintain her LPR status if she has not abandoned her LPR status or has been away from the U.S. for more than 180 days. 8 U.S.C. § 1101(a)(13)(C)(i) & (ii); 22 C.F.R. § 42.22(a). If the LPR’s trip abroad is protracted, she is still admissible to the U.S. if “this was caused by reasons beyond [her] control and for which [she] was not responsible.” 22 C.F.R. § 42.22(a)(3).
But if that person abandons her LPR status, the BIA may terminate her status with an order of removal. Karimijanaki, 579 F.3d at 715; 8 C.F.R. § 1001.1(p); 8 U.S.C. § 1101(a)(47)(B)(I). Termination of LPR status is effective upon entry of the BIA’s final order of deportation. 8 C.F.R. § 1001.1(p); 8 U.S.C. § 1101(a)(47)(B)(i).
The government must prove that an LPR abandoned her status by clear and convincing evidence. Karimijanaki, 579 F.3d at 715; 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 1240.8(a).
A person with LPR status may petition for entry visas for her family. 8 U.S.C. § 1154(a)(l)(A)(viii)(II)(B)(i)(I). If a person’s LPR status is terminated, then all visas that the person petitioned for are retroactively revoked. 8 C.F.R. *280 § 1205.1(a)(3)(i)(J). Anyone without a valid visa is inadmissible to the U.S. 8 U.S.C. § 1182(a)(7)(A)(i)(I).
An unemancipated child born to a person with LPR status, who is temporarily traveling outside the U.S., gains LPR status upon entry to the U.S. with her LPR parent. 8 C.F.R. § 211.1(b). However, if the LPR parent of that unemancipated child abandons her LPR status then that abandonment is imputed to the child. Karimijanaki 579 F.3d at 719.
III.
Whether Lateef and her family may lawfully enter the U.S. depends on her LPR status. Lateef is not admissible to the U.S. if she abandoned her LPR status. And if Lateef abandoned her LPR status, her family’s visas are retroactively revoked. Accordingly, this discussion will focus on Lateefs LPR status since it is indisputable that Lateefs misrepresentation would be immaterial, that her husband would not need a labor certificate, that her family’s entry visas would be valid and that her daughter would maintain her LPR status if Lateef has not abandoned her LPR status.
A.
 We examine “the totality of an alien’s circumstances,” Hana, 400 F.3d at 476, to determine if she has abandoned her LPR status, “including the location of the alien’s family, property, and job, and of course the length of the alien’s trip(s) abroad but also other evidence in the record demonstrating the alien’s intent with regard to maintaining her LPR status.” Karimijanaki, 579 F.3d at 715 (quotations and citation omitted). “The alien’s intent is measured by an objective standard.” Id. (citing Singh v. Reno, 113 F.3d 1512, 1515 (9th Cir.1997) (“An alien’s desire to retain his status as a permanent resident, without more, is not sufficient; his actions must support his professed intent.”)). “However, an individual with LPR status may also abandon that status by unintentional acts.” Id. (citing In re Duarte, 18 I. & N. Dec. 329, 332 n. 3 (BIA 1982) (“Lawful permanent resident status may ... be lost through abandonment, intentional or unintentional!)]”)).
Whether an LPR’s trip abroad is temporary depends on “if (a) it is for a relatively short period, fixed by some early event; or (b) ... will terminate upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time.” Id. (quotations and citations omitted). See also Hana, 400 F.3d at 476 (“[W]hen the visit relies upon an event with a reasonable possibility of occurring within a short period of time ... the intention of the visitor must still be to return within a period relatively short, fixed" by some early event.” (quotation and citation omitted)).
B.
When she attempted to enter the U.S. with her family in February 2001, Lateef did not own property or have a job in the U.S. Her parents and brothers were in the U.S. But the family members that Lateef had spent the majority of her time with since she initially immigrated to the U.S. were coming with her from Pakistan. Indeed, Lateef spent approximately sixty-five percent of her time in Pakistan after she obtained her LPR status.
Looking “through the deferential lens required for the ‘intrinsically fact-specific’ issues of abandonment and temporary visits, the evidence of record, as articulated accurately and analyzed thoroughly by the IJ and [the BIA], supports their rulings that petitioner [Lateef] abandoned her LPR status and did not take a temporary *281 visit abroad.” Karimijanaki, 579 F.3d at 718 (citation omitted).
Although Lateefs initial trip abroad could be considered temporary because it ended upon the occurrence of an event, ie., her graduation from medical school, all of her subsequent trips abroad were not “for a relatively short period, fixed by some early event” or ended “upon the occurrence of an event that has a reasonable possibility of occurring within a relatively short period of time.” Id. at 715 (quotations and citations omitted). Her final trip to Pakistan, which lasted a year and three months, shows that she abandoned her LPR status. The trip occurred because of her daughter’s behavioral problems and ended three months after her family was granted entry visas even though she wanted to return to the U.S. “as soon as possible.” This protracted journey abroad was over 180 days and “was [not] caused by reasons beyond [her] control.” 8 U.S.C. § 1101(a)(13)(C)(ii); 22 C.F.R. § 42.22(a)(3).
Lateef argues that her case is like the situation in Hana where we ruled that the petitioner had not abandoned her LPR status. 400 F.3d at 473-74. The petitioner in Hana was an LPR from Iraq and made trips to her native country during the reign of Saddam Hussein. Id. at 474. Like Lateef, the petitioner in Hana spent the majority of her time in her native country, expressed a desire to emigrate to the U.S. with her family and believed her family’s immigrant petitions would be granted in a relatively short period of time. Id.
But that is where the similarities end. The Hana petitioner was coerced into returning to Iraq by her government employer just two months after she emigrated to the U.S. and applied for LPR status for her family. Id. She stated that if she did not return when her employer summoned her that her children or other family members would be harmed. Id.
The Hana petitioner returned to the U.S. over two years later but shortly before her re-entry visa expired. Id. She brought $10,000 worth of valuables and cash with her to purchase a home and a car because she intended to remain in the U.S. and wait until her children were granted entry visas. Id. However, she returned to Iraq just two months later to help care for her terminally ill mother-in-law, but not without obtaining another reentry visa before she left. Id.
The Hana petitioner attempted to return to the U.S. two years later but Iraqi officials would not allow her to leave the country. Id. However, she was able to return to the U.S. two weeks before her re-entry visa expired. Id. INS officials interviewed her and she stated that “she was returning because her re-entry permit was about to expire and she ‘did not want to lose [her] green card.’ She also stated that she had a ticket for a return flight ..., but that she would not leave the [U.S.] unless she first obtained another reentry permit.” Id. But due to the length of her absence from the U.S. and the fact that, like Lateef, she had never worked in the U.S., owned property, or paid taxes, INS officials denied her admission to the U.S. because she had “relinquished her LPR status.” Id. at 474-75.
The BIA noted that the Hana petitioner had only been in the U.S. three months in the over four-year period of time before the INS refused her admission into the country. Id. It held that she “ ‘remained in Iraq for her convenience and choice, that she was hot compelled to remain,’” and that the INS demonstrated that she had abandoned her LPR status. Id.
We reversed the BIA for several reasons. We acknowledged that the Hana *282 petitioner was told her family would obtain visas in a relatively short period of time. Id. at 476. More importantly, we noted that she made every effort to comply with the law. Id. (“[S]he was clearly under the impression that so long as she returned to the [U.S.] before the expiration of her reentry permit, she could travel to Iraq to prepare her family members for their emigration and not risk losing her cherished LPR status.”). She had to return and remain in Iraq to protect her family from the brutality of the Hussein regime and care for her terminally ill mother-in-law. Id. at 476-77 (To keep her family safe until they were granted entry into the U.S., the petitioner “continued her [government] job [] so that Saddam’s henchman did not harm her family members on the eve of their emigration.” “[I]t is clear that [the petitioner’s] failure to put down roots in the [U.S.] was due almost entirely to her desire to help her loved ones safely flee a brutal totalitarian regime and to her obligation to assist in the care of her terminally ill mother-in-law.”). And she transferred her assets to the U.S. to help her family transition to their new life. Id. at 476 (“Another component was transporting her valuables to America so that she could lay the foundation for her family’s life in the [U.S.].”).
Only one of these factors is present in Lateefs petition. Lateef believed her family would be able to emigrate with her in a relatively short period of time. But Lateef made no attempt to comply with the law to maintain her LPR status. In fact, she lied to INS agents because she knew that she had broken U.S. immigration law. Pakistan is not a brutal dictatorship like Hussein’s Iraq. Lateefs daughter had no medical problems and Lateef did not transfer assets to the U.S. to help facilitate her family’s emigration to a new life. “Unlike [Lateef], who was traveling freely between two relatively safe democratic nations, [the Hana petitioner] was acting to protect her family from a dictatorial regime with an infamous human rights record.” Id. at 477. “[W]hile [Lateefs] decision to spend most of [her] time abroad was arguably motivated by convenience, [the Hana petitioner’s] similar decision was clearly motivated by the safety and welfare of her family.” Id.
As in Moin v. Ashcroft, 385 F.3d 415, 420-21 (5th Cir.2003), the evidence paints a “picture of a person living in Pakistan while taking a few rather short trips to the United States.”
We appreciate the predicament which confronts immigrants who marry non-citizens abroad. Because temporary visas are often unavailable and processing marital visas may take years, they must choose to live apart or risk losing their permanent resident status.... Nevertheless, we must be guided by the totality of the record.... From that perspective, we cannot say that the evidence is so compelling in [the petitioner’s] favor that no reasonable person could have made the same findings and conclusions as the immigration judge.
Id. at 421 (citation omitted). Likewise, in this case, the evidence is not so compelling to find that the BIA was wrong.
PETITION DENIED.

. "A permanent resident ... in possession of a valid reentry permit who is otherwise admissible shall not be deemed to have abandoned status based solely on the duration of an absence or absences while the permit is valid.” 8 C.F.R. § 223.3(d)(1).

. Lateef gave birth to her son in May 2000.

.On March 1, 2003, the INS ceased to exist and its functions were transferred to the Department of Homeland Security. See Homeland Security Act of 2002, Fub.L. 107-296, §§ 441, 471, 116 Stat. 2135, 2192, 2205 (codified at 6 U.S.C. § 101, et seq.). Since the relevant events in this case occurred before this change took effect, we refer to the INS as the germane government agency.